**C. E. NIEHOFF & CO., a corporation,**
**Petitioner,**

v.

**FEDERAL TRADE COMMISSION,**
**Respondent.**

**No. 11526.**

United States Court of Appeals
Seventh Circuit.

Jan. 9, 1957.

Rehearing Denied Feb. 21, 1957.

Finnegan, Circuit Judge, dissented.

Charles R. Sprowl, Whitney Campbell, James J. Magner, E. Marvin Buehler, Chicago, Ill., for petitioner, C. E. Niehoff & Co.

Robert B. Dawkins, Asst. Gen. Counsel, James E. Corkey, Earl W. Kintner, Gen. Counsel, Attys., Federal Trade Commission, Washington, D. C., Miles J. Brown, Alexandria, Va., for respondent.

Before MAJOR, FINNEGAN and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Petitioner, sometimes referred to herein as Niehoff, asks us to review an order to cease and desist issued by the respondent, sometimes referred to herein as the commission, upon a complaint charging violation of section 2(a) of the amended Clayton Act.[1]

The complaint charges that Niehoff, in its nationwide sale of automotive ignition and hydraulic brake parts to automotive jobbers competitively engaged in

---

[1] "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States * * *, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly received the benefit of such discrimination, or with customers of either of them: *Provided*, That nothing contained in sections 12, 13, 14–21, and 22–27 of this title shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: * * *." 15 U.S.C.A. § 13.

the resale of such products, discriminates in price between its small quantity purchasers and its large quantity purchasers, and that the effect thereof may be substantially to lessen competition or tend to create a monopoly in the lines of commerce in which Niehoff and its favored purchasers are engaged, or to injure, destroy or prevent competition with Niehoff, said favored purchasers or with customers of either of them.

Niehoff's amended answer admits that it is engaged at Chicago, Illinois, in the manufacture, sale and distribution in interstate commerce of automotive products and supplies to different purchasers and that it is in active and substantial competition with other companies similarly engaged in manufacturing and selling automotive products and supplies; admits that Niehoff sells its products to different purchasers at different price differentials, but alleges that such differentials are openly available to all of its purchasers and are not discriminatory, and denies that the effect thereof may be substantially to lessen competition and create a monopoly in its line of commerce; alleges that such price differentials make only due allowance for differences in the cost of sale or delivery resulting from the differing methods of quantities in which such products and supplies are sold or delivered to its purchasers; and also alleges that such price differentials as were granted by Niehoff were granted in good faith to meet equally low prices of its competitors.

Following extensive hearings before an examiner, he entered findings of fact. He concluded "that petitioner sold its products of like grade and quality to customers at different prices, that the customers competed with one another in the resale of these products, and that the different prices were discriminatory and in violation of section 2(a)  *  *  *"; that " *  *  * the differentials in price were not justified by differences in

cost under the cost proviso of section 2(a)" (except in a minor particular which the commission on review set aside); and that " *  *  * the discriminations were not justified under the 'good faith' proviso of section 2(b) of the Act." Accordingly the examiner entered a provisional order to cease and desist. Upon cross appeals to the commission by both parties, the commission, on May 17, 1955, affirmed the findings and order of the examiner with slight modification and entered the order now under review. Summarized, the basic facts, which are not in real dispute, are now stated.

Niehoff sells and distributes in commerce certain automotive products and supplies. There are many different items classified into three lines: an ignition line, a hydraulic line, and a testing equipment line.

Niehoff's total sales volume in the sample year 1949 was $2,068,499, and of this amount approximately 90% represented sales in the ignition line, 3 to 6% in the hydraulic line, 2% in the testing equipment line, and 2% in rebuilt items.

Its domestic sales were made to some 866 jobber accounts. The prices paid by these customers were based in the first instance on Niehoff's jobber price list which is the base price schedule. Niehoff grants discounts from this schedule which vary the net prices actually paid by its several jobber accounts. For discount purposes Niehoff classified its jobber customers at the beginning of each year on the basis of the purchases made during the preceding year. A 2% discount for prompt payment is accorded to all accounts regardless of classification. Niehoff grants uniform freight allowances to all jobber customers and treats all accounts uniformly in the handling of merchandise returned for credit. As found by the examiner, the various accounts are placed in one of four classifications:[1a]

---

1a. The classifications referred to are somewhat confusing, there appearing to be overlapping of the classes. This circumstance is in our view of the case immaterial.

1. Jobbers whose annual purchases are less than $1,200 are classified as "jobbers without agreement"[2] and who pay the regular jobber list price.

2. Jobbers whose annual purchases range from $1,200 to $3,600 receive Niehoff's "jobbers agreement" and as such receive the following discount and allowances from the base jobber price:

| Annual volume of purchases | Discount allowance, percent |
|---|---|
| $1,200–$2,400 | 5 |
| $2,400–$3,600 | 7 |
| $3,600 and over | 10 |

3. Jobbers whose annual purchases range from $3,600 to $6,000 are classified as "distributors without agreement" and receive a 10% discount off Niehoff's base jobber price on all purchases.

4. Jobbers whose annual purchases are in excess of $6,000 are classified as "distributors with agreement" and as such receive 10% discount off Niehoff's base prices on all purchases and the following additional discount allowances in the form of merchandise credits:[3]

| Annual volume of purchases | Discount allowance, percent |
|---|---|
| $6,000–$8,400 | 5 |
| $8,400–$12,000 | 6 |
| $12,000 and over | 7[4] |

The commission found, and it is not disputed, that this system of pricing provided different net purchase prices.

It also found, and the record shows, that Niehoff sold to more than one account in a single city or trading area and that the net prices paid by accounts within given trading areas varied. It was further found that accounts within trading areas competed with one another in selling Niehoff's products.

The commission found that Niehoff's price differentials constituted discriminations in price. It was further found that the effect of these discriminations may be to substantially lessen, injure, destroy or prevent competition in the resale of Niehoff's products. This finding took into account the size of the differentials, amounting to as much as 16% in net purchase price; the fact that the record shows that the automotive parts business is highly competitive; that jobbers stock many lines ranging from 15 or 20 for the small operator to more than 100 for the large operator and these lines generally consist of thousands of items; that net profit depends on the accumulation of small margins on the numerous items handled; and that the record also shows that the margin of profit generally runs about 4% of sales.

The commission also found that Niehoff's discounts to favored distributors contribute a direct and powerful advantage to the recipient and concluded that there was a reasonable probability that Niehoff's pricing practices substantially lessened competition at the secondary level and that the effect of discriminations may be to injure, destroy or prevent competition between purchasers receiving the benefit of the discriminations and those to whom they were not accorded.

2. In 1950 the designations used to describe the accounts in each classification were changed but the basis of classification and the buying prices remained the same for each class.

3. The additional discount allowances do not apply to purchases of service stocks, equipment and brake fluid.

4. In 1949, 299 accounts were in class 1 and purchased at jobber list less cash discount. 228 were in class 2; 241 accounts were in class 3 and 98 accounts in class 4. There was a deviation from the stated price plan in that Niehoff sold to one buying group known as Cotton States, Inc., which in 1949 was composed of nine jobbers. Niehoff treats this group as a single purchaser, selling on its class 4 basis. The jobber member pays the invoice to group headquarters and it in turn remits monthly for all purchases by its members during that month. Except for one monthly billing instead of 9, the operation saves Niehoff nothing. In 1949 the annual purchases of only one member would individually have justified the discount given.

Niehoff introduced evidence for the purpose of justifying its price differentials by differences in costs of sale and delivery. This evidence pertained to sales expenses, advertising expense, and costs of processing orders. Upon consideration of all this evidence the commission rejected Niehoff's claim that its differentials were cost-justified within the meaning of the proviso of section 2(a).

Niehoff also introduced evidence to prove that its price differentials were made in good faith to meet the equally low price of a competitor or competitors within the meaning of the good faith proviso of section 2(b) of the Act.[5] The commission found that Niehoff did not establish any price or prices as a response to a particular competitor, and that, once the base price structure was established with reference to general competitive conditions, Niehoff did not deviate to meet the prices of particular competitors. It also found that the net prices accorded by Niehoff were a reflection of its nation-wide pricing system formulated to meet competition generally and not designed to meet any particular competitor's prices. On the basis of this finding the commission rejected the claim that Niehoff's price discriminations were justified under the good faith proviso of section 2(b).

I. With the exception of certain phases of this case with which we shall hereinafter deal specially, our holding in this case is controlled by our decisions in Whitaker Cable Corporation v. Federal Trade Commission[6] and E. Edelmann & Co. v. Federal Trade Commission.[7] We

adhere to the views expressed in those cases.

■■ II. We have made a thorough search of the record and considered the evidence introduced by both parties on the issues involving cost justification and the alleged good faith of Niehoff in meeting equally low prices of its competitors. While there may be some conflict in the evidence upon these issues, we find that there is substantial evidence to support the findings of the commission.[8] Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Consolidated Edison Co. of New York v. N. L. R. B., 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126.

■ It is not the law that we may displace the commission's choice between two fairly conflicting views, even though we would justifiably have made a different choice had the matter been before us *de novo*. Universal Camera Corp. v. N. L. R. B., supra, 340 U.S. 488, 71 S.Ct. 464.

For the reasons herein set forth, the commission's order to cease and desist will be affirmed, subject to a modification to which we now refer.

III. At this point we consider Niehoff's prediction that it "would be forced out of business if the traditional pricing practices which it now follows were denied to it while its competitors are free to continue such practices." There is uncontradicted evidence in the record to factually support this prediction.

The record shows that, as to the automotive ignition line which constitutes

---

5. "Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided, however,* That nothing contained in sections 12, 13, 14–21, and 22–27 of this title shall prevent a seller rebutting

the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor." 15 U.S.C.A. § 13(b).

6. 7 Cir., 239 F.2d 253.

7. 7 Cir., 239 F.2d 152.

8. 5 U.S.C.A. § 1009(e) (5); Universal Camera Corporation v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456.

**42**

at least 90% of Niehoff's business,[9] it has 19 competitors, and included in this group are 3 competitors who presently have complaints or orders to cease and desist pending against them before the commission, the other 16 competitors being free to continue their present pricing practices unless and until cease and desist orders are entered against them in proceedings not yet commenced.

It thus appears that the order against Niehoff was entered at a time when the commission had acted against only a few of this firm's competitors. We are persuaded by Niehoff's argument that, in view of the lapse of time which is inevitably involved in proceedings before the commission, Niehoff's business will suffer economic extinction before the commission adjudicates upon trade practices of Niehoff's competitors, which in their purpose and effect are essentially similar to those condemned in the Niehoff order. This result will follow if Niehoff is required by elimination of its present selling methods to charge higher prices for its products than the prices charged by its competitors against whom the commission has not yet ruled.

■ The commission takes the position that it has no power to stay compliance with its order. It relies upon a part of section 11 of the amended Clayton Act,[10] contending that it has no discretion as to the enforcement of the law. It fails to cite that part of section 11 which provides that the commission "shall issue * * * an order requiring such person to cease and desist from such violations * * * *within the time fixed by said order.*" (Italics supplied for emphasis.) It is our opinion that this statutory language vests in the commission power to postpone the time at which an order is to take effect.

In any event, the commission in this case has not exercised this permissive power under section 11, and it argues that this court has no power to delay or postpone compliance with the commission's order. If this be true we are impotent to postpone the effective date of the order and, furthermore, under section 11 of the act we can be required to enforce the order in the manner therein provided without delay. In other words, according to the commission, we may witness and participate in, but not interfere with, the economic death of Niehoff while the commission machinery continues to operate toward cease and desist orders against Niehoff's competitors.

■ However, we do not admit judicial impotency in this situation. Section 11 of the Clayton Act [11] gives this court power, *inter alia,* to modify an order of the commission. This includes the power to change that part of an order stating when it shall take effect. We have held [12] that the power of a court of appeals to enforce, set aside or modify the commission's order is an exercise of original jurisdiction, rather than appellate jurisdiction, and that the court may by its own orders protect the rights of the parties in any manner in which any trial court of equity of general jurisdiction might do so in an injunction suit. The order in this case was issued on May 17, 1955 and directed that Niehoff "forthwith" cease and desist. This order is in the nature of an injunction. We have a right to consider its effect upon Niehoff in the light of equitable principles, and to grant relief accordingly. We have no way of knowing in advance what further proceedings, if any, will be had by the commission against Niehoff's competitors to whom we have heretofore referred. The fixing of the time at which the order against Niehoff shall become effective is a matter over which we now reserve jurisdiction, the exercise of which will depend upon the future course of the commission's proceedings against Niehoff's competitors. For that reason

9. Another 6% of Niehoff's business is in the hydraulic line where it has 10 principal competitors.

10. 15 U.S.C.A. § 21.

11. 15 U.S.C.A. § 21.

12. Natural Gas Pipeline Co. of America v. Federal Power Commission, 7 Cir., 128 F.2d 481, 484.

the order against Niehoff is hereby modified by striking the word "forthwith" therefrom and by adding to said order the following: "This cease and desist order shall take effect at such time in the future as the United States Court of Appeals for the Seventh Circuit may direct, *sua sponte* or upon motion of the Federal Trade Commission." As thus modified, the order is affirmed.

Order, as modified,

Affirmed.

FINNEGAN, Circuit Judge (dissenting).

Affirming this order of the Commission and then directing its indeterminate suspension, causes me to diverge from the majority view. Section 11 of the Clayton Act, as amended, mandates that: "The findings of the Commission * * * as to the facts, if supported by substantial evidence, shall be conclusive," 64 Stat. 1127, 15 U.S.C.A. § 21. If, as my brothers find, this order squares with the statutory yardstick then a violation of the Clayton Act has been established. But, on the other hand if the order, approved by the majority, requires modification for the reasons they state, then it would seem the Commission's order is defective since it is unsupported by evidence concerning petitioner's competitors. After all the matter involves an economic problem within a defined industry. In its opinion (T.R. 1027–1028) the Commission stated, inter alia: "The initial decision in effect held that the status of the price of respondent's competitors as lawful or unlawful was not controlling to decision here * * *. The lawfulness or unlawfulness of its competitors' prices * * * are not in issue inasmuch as respondent's defense has been legally insufficient on other grounds."

We reach much too far into the administrative agency's province by reserving our jurisdiction contingent upon "the future course of the Commission's proceedings against Niehoff's competitors." Either such matters are now before us and we have failed to properly evaluate them in reviewing evidence of price discrimination, or, they are not, now, and in that state of affairs we have no business with them. Just when this Court will decide to infuse vitality into the Niehoff order, currently in suspended animation, escapes me entirely. It appears that the majority's modification compels the Commission to investigate, or complete examination of, Niehoff's competitors at the risk of forfeiting an otherwise approved order. Whether this entails all 19 competitors or a baker's dozen is unrevealed. My grave doubts that our statutory power to *modify* Federal Trade Commission orders can be converted into policing and supervising, though perhaps obliquely, the length, breadth and sequence of Commission investigations brings me to the position I now take. Certainly we would refuse to activate the Commission upon a bare petition for mandamus to investigate the automotive ignition industry. Responsibility of achieving enforcement of the statutes Congress assigned to the Commission lies elsewhere.