**AMERICAN MOTOR SPECIALTIES CO.,**
Inc., et al., Petitioners,
v.
**FEDERAL TRADE COMMISSION,**
Respondent.

**No. 158, Docket 25675.**

United States Court of Appeals
Second Circuit.
Argued Jan. 14, 1960.
Decided May 5, 1960.

B. F. Lerch, New York City, for petitioners.

Daniel J. McCauley, Jr., Gen. Counsel, Alan B. Hobbes, Asst. Gen. Counsel, Francis C. Mayer, Ernest D. Oakland, Attys., Federal Trade Commission, Washington, D. C., for respondent.

Before CLARK, HINCKS and WATERMAN, Circuit Judges.

WATERMAN, Circuit Judge.

Absent a cost justification for volume discounts, or a competitive situation not of the seller's own making, or other exceptions to the basic theory of the Section, a seller under Section 2(a) of the amended Clayton Act, 15 U.S.C.A. § 13(a) may not charge discriminating prices based upon the volume of the buyer's purchases. In a series of cases—Standard Motor Products v. F. T. C., 2 Cir., 1959, 265 F.2d 674, certiorari denied

361 U.S. 826, 80 S.Ct. 73, 4 L.Ed.2d 69; P. Sorensen Mfg. Co. v. F. T. C., D.C. Cir.1957, 246 F.2d 687; P. & D. Mfg. Co. v. F. T. C., 7 Cir., 1957, 245 F.2d 281, certiorari denied 355 U.S. 884, 78 S.Ct. 15, 2 L.Ed.2d 114; C. E. Niehoff & Co. v. F. T. C., 7 Cir., 1957, 241 F.2d 37, modified Moog Industries Inc. v. F. T. C., 1958, 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed.2d 370, rehearing denied 355 U.S. 968, 78 S.Ct. 531, 2 L.Ed.2d 544; E. Edelmann & Co. v. F. T. C., 7 Cir., 1956, 239 F.2d 152, certiorari denied 355 U.S. 941, 78 S.Ct. 426, 2 L.Ed.2d 422; Whitaker Cable Corp. v. F. T. C., 7 Cir., 1956, 239 F.2d 253, certiorari denied 353 U.S. 938, 77 S.Ct. 813, 1 L.Ed.2d 761, rehearing denied 353 U.S. 962, 1 L.Ed.2d 912; Moog Industries v. F. T. C., 8 Cir., 1956, 238 F.2d 43, affirmed 1958, 355 U.S. 411, 78 S.Ct. 377, rehearing denied 356 U.S. 905, 78 S.Ct. 559, 2 L.Ed.2d 583—this court and three other courts of appeals have sustained the Federal Trade Commission's findings that the price system of volume discounts given by various manufacturers of automobile replacement parts has been violative of Section 2(a). In this case it is the conduct of the *buyers* from those manufacturers that is attacked.[1]

Petitioners seek review of a cease and desist order issued by the Commission on March 12, 1959, charging them with violation of Section 2(f) of the amended Clayton Act, 15 U.S.C.A. § 13(f), a section making it unlawful for buyers knowingly to induce or receive prices violative of Section 2. There are nineteen petitioners: seventeen firms "jobbing" automotive replacement parts in the New York City metropolitan area, and two buying groups, Automotive Group Buyers, Inc., and its successor, Metropolitan Automotive Wholesalers Cooperative, Inc., corporations organized by the seventeen member firms.

Petitioners' brief describes the purpose of the two buying groups in the following words, " * * * the members sought to associate themselves together in a collective activity for the purpose of achieving the economies and price advantages of larger scale buyers * * *." The method of operation of the two buying groups has been constant in the years of operation since 1938 when Automotive Group Buyers, Inc. was established. Manufacturers were requested to submit price lists to the group's executive secretary. If the price lists were approved, apparently by a committee appointed for the purpose, the member firms would place their individual orders in the name of the buying group; i. e., the orders were written on forms bearing the name of the buying group, but these forms were either sent by the individual firm directly to the manufacturer or were sent through the group office without any consolidation of member orders. Shipments were made directly to the individual firm. The reason for this group buying arrangement is clear. As the cases cited in the first paragraph of this opinion set forth, it was a frequent practice of manufacturers to grant annual rebates to buyers in the form of a percentage of the buyer's orders for the year, the percentage of rebate to sales increasing with the total dollar volume of orders. Thus, from the mere fact that an organization of buyers was able to persuade a manufacturer to treat the orders of the various individual member firms as coming from a single source, the amount of rebate for each member firm's dollar of order was increased, thereby placing each member firm at an advantage over its unorganized competitors. From the statement in petitioners' brief quoted at the beginning of this paragraph petitioners appear to concede that the two buying groups were formed for the purpose of obtaining increased rebates. The rebates were paid to the group, and a portion thereof was periodically distributed to each member. The amounts so distributed were apportioned according to the per cent which each individual firm's pur-

---

1. The Commission informs us that, as of September 24, 1959, cease and desist orders have been entered against six other groups of buyers similar to petitioners.

chases bore to the group's total purchases from the manufacturer. The remainder was accumulated, but the share of each member in this fund retained out of the rebates was earmarked according to the above formula. The Commission concedes that member firms were not required to purchase from the manufacturers whose prices had been group-approved, but it clearly was in the interest of a member to do so, and just as clearly it was in the interest of members to exert moral pressure upon fellow-members to so purchase.

At the outset, although the Commission based its case upon the prices received from three manufacturers whose pricing systems have previously been held violative of Section 2(a)—Standard Motor Products, Whitaker Cable, and Moog Industries, supra—petitioners contend that the Commission did not prove that these prices violated Section 2.

■ Petitioners first contend that the Commission failed to demonstrate that these prices may have had the effect of substantially lessening competition or of tending to create a monopoly. This contention is clearly unsound for the reasons stated in Standard Motor Products, supra, 265 F.2d at pages 676–677; Whitaker Cable, supra, 239 F.2d at pages 254–255; Moog Industries, supra, 238 F.2d at page 51. The discussion in Moog Industries, supra, 238 F.2d at pages 49–50, also disposes of petitioners' second contention that the Commission failed to prove that discriminatory rebates were granted on goods of "like grade and quality."

■ Petitioners also strenuously contend that under Automatic Canteen v. F. T. C., 1953, 346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454, the Commission failed to establish that petitioners *knowingly* induced or received discriminatory prices, a finding required by Section 2(f). Automatic Canteen held that, despite the provisions of Section 2(b), the Commission *did not establish*, prima facie, a violation of Section 2(f) merely by introducing evidence that the buyer had received prices lower than its competitors, but that the Commission must also come forward with some evidence that the buyer *knew* that the prices it was receiving violated Section 2(a). However, the Court, supra, 346 U.S. at pages 79–80, 73 S.Ct. at page 1027, spoke further in language that is here very pertinent:

"But trade experience in a particular situation can afford a sufficient degree of knowledge to provide a basis for prosecution. *By way of example a buyer who knows that he buys in the same quantities as his competitor and is served by the seller in the same manner or with the same amount of exertion as the other buyer can fairly be charged with notice that a substantial price differential cannot be justified.* The Commission need only to show, to establish its prima facie case, that the buyer knew that the methods by which he was served and quantities in which he purchased were the same as in the case of his competitor. If the methods or quantities differ, the Commission must only show that such differences could not give rise to sufficient savings in the cost of manufacture, sale or delivery to justify the price differential, and that the buyer, knowing these were the only differences, should have known that they could not give rise to sufficient cost savings." (Italics supplied.)

Petitioners of course knew that they, as individual firms, were receiving goods in the same quantities and were served by sellers in the same manner as their competitors, and hence organized themselves into a buying group in order to obtain lower prices than their unorganized competitors. Hence, by the very fact of having combined into a group and having obtained thereby a favorable price differential, they each, under Automatic Canteen, were charged with notice that this price differential they each enjoyed could not be justified. And this knowledge of each of the seventeen individual firms is imputable to the organization of which they were all members. Thus, irrespec-

tive of whether the buying groups' efforts to bargain with the various manufacturers constituted an improper *inducement* under Section 2(f), we hold that the Commission introduced sufficient evidence to fulfill the requirements of Automatic Canteen when it showed that petitioners knowingly *received* preferential price treatment of such a nature as to violate Section 2.

Fourth, petitioners contend that because the successor corporate buying group, Metropolitan Automotive Wholesalers Cooperative, Inc., was organized under the Cooperative Corporations Law of the State of New York, it was entitled to the protection of Section 4 of the Robinson-Patman Act, 15 U.S. C.A. § 13b. Quality Bakers of America v. F. T. C., 1 Cir., 1940, 114 F.2d 393, 400, holds that Section 4 does not authorize cooperatives to accept brokerage fees forbidden by Section 2(c) even though these fees are passed on to the members. Section 4 states that nothing in the Robinson-Patman Act shall prevent a cooperative association from returning to its members, producers, or consumers any part of the association's earnings. Section 4 does not confer upon cooperative associations any blanket exemption from the Robinson-Patman Act. It only protects a cooperative association from charges of violating the Act premised upon the association's method of distributing earnings. See Farmers Cooperative Co. v. Birmingham, D.C.N.D.Iowa 1949, 86 F.Supp. 201, 230. The fact that earnings which result from illegal activity may be distributed to the association's members does not insulate the association from prosecution for the illegal activity. Clearly Section 4 does not permit a cooperative to violate Section 2(f) even though its savings through receipt of discriminatory prices are passed on to its members. Neither can Section 4 be said to prohibit imputing to the cooperative knowledge possessed by its membership for purposes of establishing knowing receipt under Section 2(f).

Finally, petitioners object to the admission of three charts purporting to tabulate sales to respondents by the three manufacturers, Standard, Whitaker, and Moog, in the years 1947 through 1949. The charts were prepared by Commission accountants in order to summarize their investigation of the manufacturers' records. As we understand petitioners' argument, the charts should have been excluded because they were not properly identified as required by 28 U.S.C. § 1732. Even if we assume that these charts would have been inadmissible under 28 U.S.C. § 1732 in a judicial proceeding, there was no error in admitting them before the examiner. Willapoint Oysters, Inc. v. Ewing, 9 Cir., 1949, 174 F.2d 676, 691–692, certiorari denied 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527, rehearing denied 339 U.S. 945, 70 S.Ct. 793, 94 L.Ed. 1360.

The Commission's order is affirmed.