**MID–SOUTH DISTRIBUTORS et al. and Cotton States, Inc., et al., Petitioners,**

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

No. 17860.

United States Court of Appeals
Fifth Circuit.

Feb. 23, 1961.

Frank J. Tipler, Jr., Andalusia, Ala., David C. Murchison, Washington, D. C., Hillsman Taylor, Memphis, Tenn., Robert L. Wald, Howrey, Simon, Baker & Murchison, Washington, D. C., for petitioners.

Francis C. Mayer, Atty., F. T. C., Washington, D. C., Alan B. Hobbes, Asst. Gen. Counsel, F. T. C., Washington, D. C., Daniel J. McCauley, Jr., General Counsel, Thomas F. Howder, Miles J. Brown, Attorneys, F. T. C., for respondent.

Before JONES and BROWN, Circuit Judges, and CARSWELL, District Judge.

John R. BROWN, Circuit Judge.

We do not overwork a faithful figure to say that this is the other side of the coin. For here it really is. In a series of cases appealed from adverse decisions of the Federal Trade Commission, four Courts of Appeals have now held in seven cases[1] that manufacture-sellers violated § 2(a) of the Robinson-Patman Act by selling automotive parts at discriminatory prices through volume rebates extended either directly to individual buyers or to them through buyer-groups. Here, as did the Second Circuit in its recent case[2] we deal with the FTC's cease and desist order against *buyers* for having *bought* at discriminatory prices contrary to § 2(f).[3]

■ The petitioners are two cooperative buyer groups, Mid-South Distributors and Cotton States, Inc., and the 23 jobbers who are members of Mid-South and Cotton States. The member companies are engaged as jobbers in the sale and distribution of automotive parts through many of the southern states. The prices at which they sell to their customers are not in question here. What, and all that is involved, is the price at which the manufacturer-supplier sells to them. There are thus three categories immediately involved, the thumbnail descriptives of which reflect the respective functions of each: (1) the Co-ops, (2) the Member-Jobbers, and (3) the Suppliers. All of the three have immediate connection with the sales and prices in controversy here. In addition to these three there is another element of this economic community—the competitors of Member-Jobbers. These in turn are made up of concerns which may be divided roughly into two groups. In one group will be (a) the large chain stores, the nationally integrated oil company and tire company outlets, and authorized dealers of the huge automotive manufacturers. The other group will comprise (b) other independent individual jobbers who are neither within (a) nor a member of a Co-op buying group. In the main we think it is petitioners' unwillingness, or at least failure, to take cognizance of group (b) that underlies nearly all of their objections to the FTC order under review.

Nothing is left to the imagination as to the origin of the Co-ops or the reasons for it. Petitioners' brief frankly states that they " * * * formed the cooperative associations * * * for the purpose of achieving a measure of competitive parity with their larger, more aggressive rivals * * *," meaning

1. Standard Motor Products v. F. T. C., 2 Cir., 1959, 265 F.2d 674, certiorari denied 361 U.S. 826, 80 S.Ct. 73, 4 L.Ed. 2d 69; P. Sorensen Mfg. Co. v. F. T. C., 1957, 100 U.S.App.D.C. 406, 246 F.2d 687; P. & D. Mfg. Co. v. F. T. C., 7 Cir., 1957, 245 F.2d 281, certiorari denied 355 U.S. 884, 78 S.Ct. 150, 2 L.Ed.2d 114; C. E. Niehoff & Co. v. F. T. C., 7 Cir., 1957, 241 F.2d 37, modified Moog Industries, Inc. v. F. T. C., 1958, 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed.2d 370; Moog Industries, Inc. v. F. T. C., 8 Cir., 1956, 238 F.2d 43, affirmed 1958, 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed.2d 370;

E. Edelmann & Co. v. F. T. C., 7 Cir., 1956, 239 F.2d 152, certiorari denied 355 U.S. 941, 78 S.Ct. 426, 2 L.Ed.2d 422; Whitaker Cable Corp. v. F. T. C., 7 Cir., 1956, 239 F.2d 253, certiorari denied 353 U.S. 938, 77 S.Ct. 813, 1 L.Ed.2d 761.

2. American Motor Specialties Co. v. F. T. C., 2 Cir., 1960, 278 F.2d 225.

3. "(f) It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section." 15 U.S. C.A. § 13(f).

those in group (a). It was, they assert, this "enormous bargaining leverage of these integrated distributive organizations [group (a)] * * *" and purchases by independent jobbers "inevitably at higher prices * * *" which foreclosed "their traditional competitive position in the automotive parts aftermarket." Later on they declare "Petitioners are neither judges, antitrust lawyers, nor soothsayers; they are simply local businessmen operating in a fiercely competitive industry dominated by far larger integrated competitors [group (a)]. Petitioners joined in these cooperatives for the sole purpose of achieving some measure of competitive parity with these rivals. * * *."

Not a word is said about what happens to those in group (b) who, if the program of the Co-ops and the Member-Jobbers is successful, will feel the pinch not only of the huge competitors in group (a) but that of the Member-Jobbers as well.

The system inaugurated and followed is a very simple one. It came into being because of the traditional pricing plan in the automotive parts business. Suppliers had basic list prices. Specified successively greater percentage reductions off the list price were offered to jobbers for specified increases in dollar volume of purchases.[4] These cumulative volume rebates and graduated price schedules were accorded all purchasers and were available generally throughout the industry. To achieve these graduated dollar volume levels, the purchases for Member-Jobbers were made by the Co-op. The volume discounts were computed on the basis of the total purchases for all Member-Jobbers through the Co-op. After deducting the small operating expenses of the Co-op, these volume rebates were distributed internally to Member-Jobbers as patronage dividends proportionate to each Member-Jobber's purchases for the year. The effect of this was to give Member-Jobbers a substantially lower cost than would have been paid for the same kind and quantity of goods by such jobber individually or by an independent jobber—those in group (b).

The Commission determined that these volume discounts through the guise of purchases by the Co-ops were an unlawful discrimination in price likely to lessen competition or cause injury to the less favored competitors of the Member-Jobbers—those in group (b). The Commission further held that these activities of Member-Jobbers as well as the Co-ops constituted "knowingly to induce or receive a discrimination in price which is prohibited" by the Act. § 2(f), note 3, supra. Cease and desist orders were entered against all.

The petitioners assert two principal complaints by this appeal. First, the operative effect of the order is to prohibit distribution of net earnings by a cooperative contrary to the freedom to do so explicitly recognized by § 4 of the very same Act.[5] Second, the evidence was insufficient to establish a violation of § 2(f). This latter breaks off into about three subdivisions.[6] The only substantial one is the contention that the Commission failed to meet its burden of

---

4. The seller cases, note 1, supra, related primarily to this basic volume rebate system, rather than the use of such a system in sales through the guise of buyer-cooperative groups. Of course, this traditional volume rebate plan was not finally condemned until 1954–1956.

5. "Nothing in * * * this Title shall prevent a cooperative association from returning to its members, producers, or consumers the whole, or any part of, the net earnings or surplus resulting from its trading operations, in proportion to their purchases or sales from, to, or through the association." 15 U.S.C.A. § 13b.

6. These contentions briefly are:
 1. There is no evidence that Member-Jobbers are "engaged in commerce."
 2. There is no evidence that Member-Jobbers or the Co-ops received any "discrimination in price."
 3. There is no evidence that they "knowingly" induced or received prohibited price discrimination as petitioners did not have "knowledge" that the lower prices they paid (a) would have an adverse effect on competition, (b) were not justified by savings in sellers' costs or (c) were not offered by the selling suppliers to meet competition.

proving the petitioners knew that the Suppliers could not justify such preferential prices as either a § 2(a) lower-cost or a § 2(b) meeting-of-competition.

 Neither the status as a cooperative nor § 4, note 5, supra, affords the insulation here asserted. The order of the FTC does not undertake to prohibit distribution of earnings. The order, on the contrary, strikes at the jugular—the transactions which beget the so-called earnings. The petitioners virtually concede—and in conceding give up nothing in view of Maryland and Virginia Milk Producers Ass'n, Inc. v. United States, 1960, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed. 2d 880, as well as others—that § 4 gives no immunity to the Co-op as an entity. It must, as would any other organization of comparable size, respect the prohibitions against discriminatory price differentials.

 But petitioners insist that since the FTC order does not purport to find any discrimination in the price charged by Suppliers as between these Co-ops and other buyer groups or entities for like purchases, the effect of this order is to infringe upon the *internal* operation of a cooperative. So long, the argument continues, as the cooperative as an entity refrains from actions violative of the anti-trust statutes, it may be used freely for purchases for the benefit of the Member-Jobbers with the unrestricted right to return to them "the net earnings * * * resulting from its trading operations, in proportion to their purchases or sales from, to, or through the association."

The § 4 exemption has no such purpose. It recognizes cooperatives as valid or-

ganizations. But it does not turn the entity loose to acquire on behalf of its members, through the guise of group purchasing, price differentials or other preferences to which each would not otherwise be entitled. American Motor Specialities Co., Inc. v. F. T. C., 2 Cir., 1960, 278 F.2d 225, 229; Quality Bakers of America v. F. T. C., 1 Cir., 1940, 114 F.2d 393, 400; cf. Maryland and Virginia Milk Producers Ass'n v. United States, supra. We purposely leave to a future day the problem of delineating the activities which may rightfully come within the congressional purpose of leaving cooperatives "free to seek through co-operative endeavor the economies and savings of mass operations * * *" and assure to them "any real economies and savings to which mass operations entitle them * * *."[7]

We may put aside quickly the contention that there was inadequate proof either of interstate purchases or knowledge that the price differential constituted discriminatory injury or damage to competitors of the Member-Jobbers.

 The first rests upon a total misconception of the transaction involved in this proceeding and under the Act. As to buyers, what the statute covers and forbids is the receipt of a discriminatory price differential in the *purchase* of goods from suppliers. It does not involve the resale of such goods by that buyer. Consequently the many cases [8] arising under the Fair Labor Standards Act, 29 U.S.C.A. §§ 201–219, testing resales after receipt of the goods in interstate commerce are of utterly no relevance. Here it was overwhelmingly established that most, if not all, of the

---

7. Congressman Utterback, chairman of the House Conferees, 80 Cong.Rec. 9415–19 (June 15, 1936). We are reminded quite recently that, despite his prominence in the handling of this statute in the legislative process, the congressional purpose is to be determined by the legislation as enacted and not necessarily the statements made by Congressman Utterback. F. T. C. v. Anheuser-Busch, Inc., 1960, 363 U.S. 536, 553, 80 S.Ct. 1267, 4 L.Ed. 2d 1385.

8. Mitchell v. Livingston & Thebaut Oil Co., 5 Cir., 1958, 256 F.2d 757; Mitchell v. C. & P. Shoe Corp., 5 Cir., 1960, 286 F.2d 109; Allesandro v. C. F. Smith Co., 6 Cir., 1943, 136 F.2d 75, 149 A.L.R. 382; Spencer v. Sun Oil Co., D.C.D. Conn.1950, 94 F.Supp. 408; Brenner v. Texas Co., D.C.N.D.Cal.1956, 140 F. Supp. 240, 243; Dial v. Hi Lewis Oil Co., D.C.W.D.Mo.1951, 99 F.Supp. 118; Roland Electric Co. v. Walling, 1946, 326 U. S. 657, 666–667, 66 S.Ct. 413, 90 L.Ed. 383.

questioned purchases by the Member-Jobbers through the Co-ops moved directly in interstate commerce.

 The second contention—inadequacy of the evidence to establish an injurious discriminatory price or knowledge thereof—apart from the problem of the burden of proof which we discuss subsequently—is merely the reiteration of a contention now rejected in every one of the seller cases, note 1, supra. Whether a price differential has the reasonable likelihood of injury to competitors is the identical question whether the inquiry concerns those who sell or those who buy at such prices. A simple, but awesome, economic fact was overwhelmingly proved—a Member-Jobber obtained substantially the same type and quantity of goods at a price substantially lower than his group (b) independent competitors. That hurt. That hurt the less favored purchasers. It was that injury which Congress sought to prohibit. F. T. C. v. Simplicity Pattern Co., 1959, 360 U.S. 55, 62–64, 79 S.Ct. 1005, 3 L.Ed.2d 1079; cf. F. T. C. v. Anheuser-Busch, Inc., 1960, 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed. 2d 1385. All persons—sellers or purchasers, corporate or animate—must now know, constructively or actually, that price discriminations which injure are prohibited. It is no defense either to sellers or buyers that either was ignorant of that much of the law's requirement. The differences in price, of course, may perhaps be justified by the seller to overcome the law's characterization of the difference as a prohibited discrimination. When that happens obviously no violation occurs. But that is because of justification, not the absence of economic injury.

So far as the specific element of discriminatory injury is concerned, the Government's § 2(f) burden of proof is satisfied by showing price differentials of a kind which would cause or likely cause injury to competitors. Cf. F. T. C. v. Simplicity Pattern Co., supra, 360 U.S. 55, at page 64, 79 S.Ct. 1005, at page 1011. This phase is not bound up with the buyers' *knowledge* that the seller would be unable to justify the differential. Cf. F. T. C. v. Anheuser-Busch, supra.

 This is, of course, in sharp contrast to the §§ 2(a) and 2(b) lower-cost or meeting-of-competition defenses of the seller.[9] As to these, in a § 2(f) proceeding it is a part of the Commission's burden of going forward with the evidence to show that the buyer *knew* that the seller could *not* justify the price differential under either one or both. Automatic Canteen Co. of America v. F. T. C., 1953, 346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454.

Under that case it is not sufficient merely to show the receipt of a price differential which likely would injure. For the buyer "knowingly to induce or receive" a price "prohibited by this" Act, it is essential that the Commission go further and establish that the buyer had reason to know that the seller could not meet either defense. The decision hardly meant, however, to impose any rigid mechanical requirements. On the contrary, the Court's opinion reflects an awareness that this critical knowledge of the buyer as to both (a) the underlying facts constituting the asserted justification and (b) the conclusion that it would not legally constitute a justification may have to be established from indirect cir-

---

9. Lower-cost defense is found in § 2(a), 15 U.S.C.A. § 13(a). This section forbids discrimination "in price between different purchasers of commodities of like grade and quality." Quantity, as such, was no longer to be an automatic basis for price differential. Under the Robinson-Patman Amendments that was to be handled by the proviso that nothing in the Act "shall prevent differentials which make only due allowance for differences in the cost of manufacturer, sale, or delivery resulting from the differing methods

or quantities in which such commodities are to such purchasers sold or delivered * * *." As to this the seller has the burden under § 2(b).

The meeting-competition defense is found in the proviso of § 2(b) that nothing in the Act "shall prevent a seller rebutting the prima facie case * * * by showing that his lower price * * * to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor * * *."

cumstantial inferences. Rarely will buyers have committed the crudities to permit categorical and direct proof. Of course, this is not to let down the bars. The imponderable, elusive nature of "costs" which led the Court to impose the *laboring oar* on the *Commission* rather than on the buyer makes it necessary that like protection—if not more so—be afforded the buyer where the attack is circumstantial. But within those limits much is available from which safely to draw reliable inferences.

 With its 1306 printed pages and hundreds of detailed, tabulated exhibits, we could not begin to detail the evidence of this record. The sum of it, briefly compressed, is quite sufficient to show the basis for inferences of buyer knowledge of seller non-justification.[10] The outstanding factor is that as to a specific purchase order the particular Member-Jobber knew two things. First, the price he was obtaining through the Co-op was substantially lower than his group (b) competitors were required to pay.[11] Second, for all practical purposes, the order and shipment were handled exactly the same. It is true that the Member-Jobber forwarded the order to the Supplier on a *Co-op order form* which obtensibly reflected a purchase of the goods for the Co-op. But this order form showed that shipment was to be made to the specified Member-Jobber. The buyer knew that this procedure represented no real savings in cost to the seller. Invoices were, of course, sent by the Supplier to the Co-op which was presumably liable therefor. But the Member-Jobber as buyer knew that the volume discount was extended, not because of increased credit reliability acquired by the presence of the Co-op as a sort of guarantor, but solely because of the increased volume of total purchases. The buyer could not reasonably have entertained any idea that he was getting preferred treatment over his competitor because credit costs were less. Moreover, there was no proof that this is why Suppliers were selling at more favorable terms.

Of course, all of this occurred in the setting which the Trial Examiner aptly characterized as "the facts of life" of the automotive parts business. The simple truth was that these volume discount rebates were offered indiscriminately to jobbers as an industry-wide competitive practice. They were extended by Suppliers to induce greater purchases and not because the narrow price differential in each minutely graduated price tier represented any real difference or savings in costs.[12] Everyone was doing it. Indeed, that is why these Co-ops came into being—their Member-Jobbers wanted to get in on the act.[13] The presenta-

---

10. In the seller cases, note 1, supra, the principal defense has been the contention that there was no injurious discrimination. The § 2(a) lower-cost defense has been raised in some but has been consistently overruled. See Standard Motor Products v. F. T. C., 265 F.2d at page 676; C. E. Niehoff & Co. v. F. T. C., 241 F.2d at page 41.

11. This is implicit in the structure of the volume rebate pricing system.

12. This is illustrated by one of the principal Suppliers volume rebate schedules on an annual retroactive basis:

| Net purchases during each fiscal year | Retroactive Rebate (percent) |
|---|---|
| Under $1,000 | None |
| $1,000 to $4,999 | 5% |
| $5,000 to $7,499 | 7½ |
| $7,500 to $9,999 | 9 |
| $10,000 to $12,499 | 10 |
| $12,500 to $14,999 | 12 |
| $15,000 to $17,499 | 14 |
| $17,500 to $19,999 | 15 |
| $20,000 to $22,499 | 16 |
| $22,500 to $24,999 | 17 |
| $25,000 to $27,499 | 18 |
| $27,500 and over | 19 |

13. For example, in purchases from the same Supplier under its schedule, note 12, supra, a Member-Jobber's purchases totaling less than $1,000 and therefore subject to no volume discount nevertheless received at 19% discount through aggregation of all Member-Jobbers' purchases that year. Other Member-Jobbers with purchases warranting 5% discount likewise received 19% rebate, or an advantage of 14%. Out of a total of $33,482.88 group purchases through

tion to Suppliers by the Co-ops in seeking a discount arrangement was primarily one emphasizing volume only. The effort was not to convince a prospective Supplier that through the group purchases of the Co-op, economies would be effected. What was sought, and all that was sought, was parity with others who bought a like quantity. This was quite without regard to whether there were or were not savings.

In addition to these circumstances, the record actually contains positive evidence that at least three of the major Suppliers acknowledged they could not justify the price reductions on the basis of lower costs. Of course, under Automatic Canteen this would not automatically convict a buyer. Quite possibly a buyer in good faith could think that the seller was able to justify the cost differential even though that seller knew it could not. But it goes a long way. If the Supplier-sellers knew this—even though they were late facing up to the fact [14]— it is not unreasonable for the trier to conclude that no one in that business should seriously have entertained any notion to the contrary.[15]

Nor was a different conclusion compelled by testimony that on inquiry by Co-op representatives each of a great number of Suppliers assured the Co-op that it could justify the cost differential. As a technical matter, the testimony was of a vague sort as to times, places and persons. More than that, repeated parrot-like for a succession of companies indiscriminately including many who extended no volume discounts and from whom individual jobbers could buy cheaper than through the Co-ops, it amounted to nothing more than an assurance that the Suppliers would give the Member-Jobbers the dollar volume rebate benefits for the group buying of their individual needs.

Even less need be said of the § 2(b) seller justification to meet competition.[16] The Co-ops were not formed to give Suppliers an opportunity to meet competition with other Suppliers. The Co-ops were formed to get from Suppliers who were already committed to the volume rebate practices the benefit of that competitive method for individual jobbers through the pooling of orders. What was sought was not a benefit *for* one Supplier because individual jobbers could get a like advantage from another Supplier. What was sought was a benefit which the individual jobbers at their volume level could get from no one. The Co-ops, in an effort to show a lower-cost seller justification for the differential, stressed the value of sales service rendered by the Co-ops to Suppliers. In other words, it was almost invariably the case of the Co-ops seeking out the Supplier to obtain from a Supplier a volume discount con-

---

the Co-op, the Member-Jobbers received volume rebates which exceeded by $4,-478.06 the amount that would have been received by the individual purchasers.

14. Representatives of several Suppliers in testifying in this proceeding acknowledged that in seller case proceedings, see note 1, supra, accountant witnesses on behalf of such sellers acknowledged that the price differentials could not be cost-justified.

15. Among other "facts of life" which gave meaning to all of these circumstances was the nature of the immediate activities in the operation of each of the Co-ops. In Cotton States, these were handled by an owner of one of the Member-Jobbers right along with his regular jobber activities. Mid-South had one em-

ployee doing essentially bookkeeping accounting work. There was no Co-op inventory, warehousing or distribution. There were undoubtedly annual or periodic meetings of the members affording certain prospective suppliers an opportunity to show their line. But the industry-wide practice of volume rebates rested on dollar volume of purchases only without regard to whether it was more, or less, convenient or inexpensive to such supplier.

16. In none of the seller cases, note 1, supra, has this been successfully maintained. It appears to have been urged only in these: Standard Motor Products v. F. T. C., 265 F.2d at page 677; C. E. Niehoff & Co. v. F. T. C., 241 F.2d at page 41; E. Edelmann & Co. v. F. T. C., 239 F.2d at page 156.

**520**

tract. A buyer earnestly negotiating with a Supplier to obtain from such Supplier the benefit of that Supplier's volume discount tables already in effect can certainly not urge that he was entitled to assume that the Supplier was extending such price differentials as a means of meeting competition with other Suppliers. And yet, once we get out of the awkward double negatives [17] of the Automatic Canteen rule that is in effect what petitioners assert here.

The Commission therefore adequately sustained its burden of going forward with the evidence. And on the total evidence the Commission, applying correct legal standards, determined as finder of the fact that these volume rebates through the guise of Co-op purchases constituted price discrimination prohibited by the Act, that is, not within seller justification. There it ends.

■ If this is to entrench further the large chain-store automobile-gasoline-dealer competitors and aggravate, not lessen, the competitive disadvantage which these Member-Jobbers must bear, the result, if bad economics or bad social policy, is for Congress to change. Until that is done, one caught in the middle cannot, to ward off his huge and overpowering rival, injure, even unwittingly, a smaller one. When David slays Goliath no one else may be hurt. That is what the Commission determined was the result here. The Act, on these facts, empowered it to order it stopped.

Affirmed.

JONES, Circuit Judge, concurs in the result.

17. "We therefore conclude that a buyer is not liable under § 2(f) if the lower prices he induces are either within one of the seller's defenses such as the cost justification or *not* known by him *not* to be within one of those defenses." 346 U.S. 61, at page 74, 73 S.Ct. 1017, at page 1025.

This was followed shortly by this statement. "Assuming, as we have found,

that there is no substantive violation if the buyer did *not* know that the prices it induced or received were *not* cost-justified, we must in this case determine whether proof that the buyer knew that the price was lower is sufficient to shift the burden of introducing evidence to the buyer." 346 U.S. 61, at page 74, 73 S. Ct. 1017, at page 1025. (Emphasis supplied.)