**RON TONKIN GRAN TURISMO, INC.,**
**Plaintiff-Appellant,**

**v.**

**FIAT DISTRIBUTORS, INC., and**
**Wakehouse Motors, Inc.,**
**Defendants-Appellees.**

**No. 79–4003.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 4, 1980.

Decided March 2, 1981.

---

Roger Tilbury, Portland, Or., argued for plaintiff-appellant; Carlton R. Reiter, Portland, Or., on brief.

James H. Clarke, Dezendorf, Spears, Lubersky, Campbell & Bledsoe, Andrew P. Kerr, Gilbertson, Brownstein, Sweeney, Kerr & Grim, Portland, Or., argued for defendants-appellees; John R. Gilbertson, Wayne Hilliard, Portland, Or., on brief.

Before VAN DUSEN,* KILKENNY and HUG, Circuit Judges.

KILKENNY, Circuit Judge:

Appellant, on November 26, 1975, brought this antitrust action against Fiat Distributors, Inc. (FDI) and Wakehouse Motors, Inc. (Wakehouse) alleging violations of Sherman Act §§ 1 and 2 and Clayton Act § 3. Appellant is a dealer in foreign cars in Portland. FDI is the United States distributor of Fiat automobiles and Wakehouse is the only Fiat dealer in the Portland area.[1]

---

* The Honorable Francis L. Van Dusen, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

1. Since 1972 Fiat has had multiple dealers in nearly all metropolitan areas. In 1972 Fiat established outlets in Vancouver, Washington and Gladstone, Oregon. These dealers are, by appellant's estimation, 8.6 and 12.2 miles from Portland's core area.

This action was instituted after appellant's unsuccessful attempt to become the second Fiat dealer in the Portland area.

The case was referred to a magistrate who found that appellant's complaint included the following claims: (1) monopoly; (2) attempt to monopolize; (3) conspiracy to monopolize; (4) tying arrangements; (5) group refusal to deal; and (6) price fixing. Both appellees moved for summary judgment on all issues. On January 25, 1978, the magistrate, in his findings and recommendations, concluded that both appellees were entitled to summary judgment on all issues. Appellant filed objections to the magistrate's findings and recommendations and the district court judge, after a *de novo* review, entered an order on December 4, 1978, which affirmed the magistrate's findings and recommendations and dismissed the action. This appeal followed. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

This controversy centers upon the rejection of appellant's application for a Fiat dealership. After a period of preliminary discussion and preparation,[2] a Fiat franchise application was signed on October 18, 1974. Appellant ordered cars and parts and gave Fiat a check for $32,493.95. The application clearly states that no binding agreement was created. The application, in order to be final, required home office approval. Appellant's check was returned on November 25, 1974. The application was not approved.

Appellant contends that the dealership arrangement would have been consummated but for the intervention of Wakehouse.[3] After learning of appellant's impending appointment, a representative of Wakehouse made a trip to Fiat's national headquarters on October 21, 1974. Appellant characterizes this visit as an attempt on the part of Wakehouse to protect its position as the sole Fiat dealer in the Portland area, and asserts that Wakehouse prevailed upon Fiat to reject the application for a new dealer. These facts allegedly support the existence of an agreement between FDI and Wakehouse to exclude a competitor of Wakehouse, and appellant maintains that this arrangement constitutes a *per se* violation of the antitrust laws.

Appellant maintains that the result of Wakehouse's exercise of "veto" power over the appointment of a new dealer has not been good "for Fiat, for customers, for competition in general, and certainly not for Ron Tonkin Gran Turismo." The negative impact on competition is premised upon appellant's assertion that Wakehouse has a monopoly in the relevant product and geographic market. The relevant market is defined as Fiat cars, parts, service and warranty work in the Portland area. Appellant's definition of the relevant market is based on its unsubstantiated belief that for a sizeable number of customers only a Fiat will do. Because Fiats, in appellant's opinion, constitute a separate market, Wakehouse's position as the sole dealer in the Portland area allows it an unrestrained power to exact exorbitant profits in its sales of Fiat cars, parts, service and war-

2. Appellant contends that during the application process it was induced by FDI "(1) to move its entire operation to a new location where it took a long-term lease at $2500 per month (including taxes), (2) to spend a great deal of money in renovating the new plant, and (3) to surrender the two fastest moving lines of vehicles (Honda and Saab), neither of which could thereafter be recaptured, relying upon Fiat's express assurance that if it did all these things, the Fiats would be delivered." Appellant's Reply Brief at 4.

3. Appellant also contends that the alleged agreement to exclude it from the market extended beyond the simple vertical arrangement between FDI and Wakehouse. The agreement to block the appointment of additional dealers allegedly included members of the Northwest Fiat Dealers Association. On May 21, 1975, members of the association sent a mailgram to FDI which expressed grave concern as to the appointment of additional dealers and requested an indication of FDI's intent with respect to areas in which sales were lagging (Portland was one of these areas). This mailgram, which seems to be the only shred of evidence of involvement of any other dealers, allegedly supports the claim that there existed a wide horizontal conspiracy to bring about a horizontal division of the market or at least the elimination of appellant as a prospective competitor.

ranty work. Appellant continually claims that, as a result of this alleged monopoly position, Wakehouse's profit margins have been excessively high.

FDI contends that this litigation "is a bold attempt by an auto dealer to muscle his way into Fiat's dealer organization through abusive and meritless litigation." The evidence, in FDI's view, indicates that FDI, at the request of a local dealer with unsatisfactory sales, refrained from deciding whether to appoint an additional dealer while the existing dealer attempted to increase sales. FDI explains that it gave Wakehouse two 90–day probationary periods, ending in June, 1975, in which to increase sales. The possibility of an additional dealer was used to stimulate Wakehouse to improve its sales efforts. Wakehouse reached the targets FDI had set and the question of appointing appellant was dropped. FDI contends that this conduct by a small distributor at the behest of a single dealer in a market dominated by competitive brands does not violate Section 1, and that it was entitled to summary judgment.

It is clear that FDI has a different conception of the relevant market. FDI maintains that the market is much broader than simply Fiat cars. FDI asserts that there are many competing types of automobiles. In fact, appellant acknowledges this on many occasions. FDI asserts that foreign cars constitute the principal competition. Fiat's share of the foreign car market in Portland was between 2.48%–3.51% from 1972–1974 and it rose to 5.2% in 1975. Its percentage of total car registration varied from .61%–1.87%.

In the course of the Fiat dealership application process, Fiat allegedly insisted that appellant divest itself of two competing lines of automobiles (Honda and Saab) before the franchise would be granted. Appellant maintains that it

"did so relying upon Fiat's assurance that the franchise would follow as a matter of course, but thereafter, Fiat acceded to the importuning of Wakehouse, and declined to ship the cars and to formally issue the Fiat franchise as it had prom-

ised. This . . . is a violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act because it is a tying arrangement and therefore a per se violation, and/or an offer of an exclusive dealing arrangement on the condition that Tonkin not use or deal in the goods and merchandise of a competitor of Fiat, and therefore, violates the rule of reason. In either event (either as a tying arrangement or an exclusive dealing arrangement) the Sherman and Clayton Acts have been transgressed." Appellant's brief at 5–6.

FDI's response to this argument is simply stated: "The baselessness of this litigation is illustrated by GT's charge that Fiat imposed upon it an unlawful 'tying' or exclusive dealing arrangement, based on a statement of a Fiat representative that he did not want Hondas and Saabs to be sold from the same location as Fiats." Aside from the legal obstacles to appellant's assertion of a colorable claim of an illegal tying or exclusive dealing arrangement, FDI notes several factual problems: (1) appellant could never secure permission from Honda or Saab to sell their cars from Tonkin's SW Morrison Street store (the location of the prospective Fiat dealership); (2) appellant did not "surrender" Honda, but transferred it to his Chevrolet agency; and (3) the Saab franchise was terminated because the distributor was understandably upset over appellant's miserable sales performance.

The magistrate's findings and recommendations, later adopted by the district judge after a *de novo* review, show that appellant had raised many factual issues, but concluded that they were immaterial, *i. e.*, they could not prevent the appellees from prevailing at trial. Summary judgment was granted with respect to the Sherman Act § 2 counts and the propriety of this ruling has not been questioned on appeal. Some of the magistrate's observations with respect to those counts are, however, relevant to the issues at hand. The magistrate concluded that

"The relevant-product market is not Fiats; it is cars in general. The automobile

market has always shown high cross-elasticity of demand. There is nothing so special about a Fiat that a prospective purchaser will refuse to buy a Datsun or Chevette, no matter what the price of a Fiat. Other courts have considered and rejected allegations similar to Tonkin's with respect to Cadillac, *Mogul v. General Motors Corp.*, 391 F.Supp. 1305 (E.D.Pa. 1975), *aff'd.*, 527 F.2d 645 (3d Cir. 1976), and Dodge, *Mt. Lebanon Motors, Inc. v. Chrysler Corp.*, 283 F.Supp. 453, 461 (W.D.Pa.1968), *aff'd.*, 417 F.2d 622 (3d Cir. 1969). Plaintiff should not be allowed to go to trial on its unsupported allegation that, for 'a sizeable number of customers ... [o]nly a Fiat, or a Lancia, will do.'"

The magistrate also rejected the Section 2 claims with respect to the "sub-markets", *e. g.*, parts, largely because of the conclusion that it would be inappropriate to fragment the case. Concluding that it was the rejection of the application for the car dealership that was fundamentally at issue, the magistrate refused to give extended consideration to the so-called "sub-markets." The parts claim, and presumably service and warranty work as well, was considered to be so intertwined with the sale of Fiat cars that the court treated them as a unit.

The magistrate also granted summary judgment with respect to appellant's tying arrangement allegation. The magistrate cited a number of factors which led him to conclude that appellant's allegation that FDI demanded that it divest itself of its Honda and Saab dealership did not remotely suggest the existence of a tying arrangement. Most simply, the magistrate concluded that "Plaintiff simply fails to show the existence of two separate products."

Furthermore, the magistrate granted summary judgment with respect to appellant's refusal to deal or group boycott claim. After drawing all inferences in favor of appellant, the magistrate concluded that FDI and Wakehouse had an agreement to maintain an exclusive distributorship arrangement in the Portland market. He found

"The exclusive Wakehouse dealership excludes other Portland dealers, including

plaintiff, only from the Fiat market, not from the automobile market. They may freely deal in many brands which compete with Fiat and are substantially equivalent. Plaintiff's case citations concern only situations in which large numbers of dealers and distributors agreed to exclude selected dealers or in which a plaintiff was entirely excluded from a relevant market.... The arrangement between Fiat and Wakehouse is a proper exclusive dealership under the antitrust laws. Wakehouse has no power over Fiat's licensing of other distributors other than ordinary business leverage. Fiat will change to another dealer or dealers when its economic interests, as it perceives them, so require."

Before proceeding to a discussion of the legal issues which are raised on appeal, it is important to emphasize one issue that is not involved. This is clearly not a contract action. Although appellant, on occasion, has maintained that FDI breached an existing contract, we note that this is simply an antitrust action. In fact, in a state court action arising out of the same set of facts the Court of Appeals of Oregon has stated "there was no existing contract between plaintiff and Fiat but only the prospect of one." *Ron Tonkin Gran Turismo, Inc. v. Wakehouse Motors, Inc.*, 46 Or.App. 199, 210, 611 P.2d 658, 664 (1980) (footnote omitted), *petition for review denied*, 289 Or. 373 (1980). The court mentioned in a footnote that "Plaintiff claims there was an existing contract but the trial court ruled against plaintiff on this point and plaintiff does not appeal from this portion of the court's ruling." *Id.* 46 Or.App. at 210, n. 6, 611 P.2d at 664, n. 6. It is clear, therefore, that we are simply dealing with FDI's rejection of appellant's *application* to become an additional dealer in the Portland area.

## ISSUES

A. Whether the grant of summary judgment with respect to the group boycott or refusal to deal claim was inappropriate because of the existence of a genuine issue of material fact.

B.   Whether the grant of summary judgment with respect to the tying or exclusive dealing arrangement was inappropriate because of the existence of a genuine issue of material fact.

## DISCUSSION

### A.   *SUMMARY JUDGMENT.*

FRCivP 56(c) states, in relevant part, that "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." It is settled law that

> "The burden is upon the party seeking the judgment to demonstrate the absence of any material fact and that the moving party is entitled to judgment as a matter of law.... In our examination of the record, we are required to draw all inferences in the light most favorable to the party opposing the motion...." *Blair Foods, Inc. v. Ranchers Cotton Oil,* 610 F.2d 665, 668 (CA9 1980) (Citation omitted).

This circuit has often noted that summary judgment is not particularly favored in antitrust litigation. *E. g., id.*[4] It is clear, however, that this general reluctance does not preclude the use of summary judgment in antitrust litigation. *See Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1111 (CA5 1979). The mere existence of an antitrust claim in a complaint does not render that complaint immune from Rule 56. In the absence of "any significant probative evidence tending to support the complaint", *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569, *rehearing denied,* 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968), summary judgment is appropriate.

"Indeed, the very nature of antitrust litigation would encourage summary disposition of such cases when permissible. Not only do antitrust trials often encompass a great deal of expensive and time consuming discovery and trial work, but also, ..., the statutory private antitrust remedy of treble damages affords a special temptation for the institution of vexatious litigation." *Lupia v. Stella D'Oro Biscuit Co., Inc.,* 586 F.2d 1163, 1167 (CA7 1978), *cert. denied,* 440 U.S. 982, [99 S.Ct. 1791, 60 L.Ed.2d 242] (1979). *Cf. Thi-Hawaii, Inc. v. First Commerce Financial Corp.,* 627 F.2d 991 (CA9 1980).

In order to withstand a motion for summary judgment it is simply not enough to refer to disputed factual issues. The factual issues must be *material.* "A material issue is one which may affect the outcome of the litigation." *Mutual Fund Investors, Inc. v. Putnam Management Company, Inc.,* 553 F.2d 620, 624 (CA9 1977). As this court has said " 'The showing of a "genuine issue for trial" is predicated upon the existence of a legal theory which remains viable under the asserted version of the facts, and which would entitle the party opposing the motion (assuming his version to be true) to a judgment as a matter of law.' " *Bushie v. Stenocord Corporation,* 460 F.2d 116, 119 (CA9 1972).

### B.   *GROUP BOYCOTT OR CONCERTED REFUSAL TO DEAL.*

■   Section 1 of the Sherman Act proscribes "Every contract, combination ... or conspiracy, in restraint of trade." 15 U.S.C. § 1. In order for a restraint to run afoul of the antitrust laws, however, it must be "unreasonable." Certain conduct has been held to be unreasonable *per se, i. e.,* once a court has identified such conduct it is foreclosed from undertaking an inquiry into its rea-

---

**4.** The Supreme Court has said that

"We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-

examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.' " *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). (Footnote omitted).

sonableness. *Per se* treatment is warranted, in certain areas because "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The Court has emphasized that any "departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than ... upon formalistic line drawing." *Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 58–9, 97 S.Ct. 2549, 2561–62, 53 L.Ed.2d 568 (1977).

One type of activity that is commonly cited as being *per se* illegal is the group boycott or concerted refusal to deal. Appellant relies on *Klor's v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), and its progeny for the proposition that the instant case fits within the "group boycott" rationale. In *Klor's*, Broadway-Hale, a chain of department stores, operated one of its stores next door to Klor's retail store. The two stores competed in the sale of radios, televisions, refrigerators and other household appliances. Broadway-Hale, apparently disturbed by Klor's price-cutting tactics, approached ten national manufacturers and their distributors and prevailed upon them to either not sell to Klor's or sell to it only at discriminatory prices and on highly unfavorable terms. Klor's brought an action claiming that this concerted refusal to deal constituted an illegal group boycott. The defendants moved for summary judgment, arguing that there was no public injury because there were hundreds of other appliance retailers, some within blocks of Klor's who sold competing brands of appliances, including those the defendants refused to sell to Klor's. The Supreme Court concluded that a group boycott of this nature would always be condemned, regardless of any adverse effect on competition.

> "Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category. They have not been saved by allegations that they were reasonable in the specific circumstances.... Even when they operated to lower prices or temporarily to stimulate competition they were banned." *Id.* at 212, 79 S.Ct. at 709. (Footnote omitted).

The Court noted that it was not faced with "*a case of a single trader refusing to deal with another, nor even of a manufacturer and a dealer agreeing to an exclusive distributorship. Alleged in* [the *Klor's*] *complaint is a wide combination consisting of manufacturers, distributors and a retailer.*" *Id.* at 212–3, 79 S.Ct. at 709–710. (Footnote omitted, emphasis added).[5]

*Klor's* has often been criticized, not so much because of the result reached, but because the Court failed to articulate with any degree of precision a definition of "group boycott" or to offer an explanation for why all concerted refusals to deal warranted *per se* treatment. *See, e. g.*, Bauer, *Per Se Illegality of Concerted Refusals to Deal: A Rule Ripe for Reexamination*, 79 Colum.L.Rev. 685 (1979); Rahl, *Per Se Rules and Boycotts Under the Sherman Act: Some Reflections on the* Klor's *Case*, 45 Va.L.Rev. 1165 (1959). In fact, one commentator, after examining the Supreme Court's discussion in *Klor's* and considering the feasibility of articulating a workable definition of group boycotts, concluded that "It seems even more clear that any comprehensible per se rule for boycotts is ... out of the question." *Rahl, supra*, at 1173. "Indeed, there is more confusion about the scope and operation of the *per se* rule

---

5. *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), relied upon by appellant, is like *Klor's*, in that it involved a wide ranging conspiracy and did not offer any precise definition of those group boycotts which warrant application of the *per se* rule. Also, *General Motors* is typically viewed as a largely *horizontal* conspiracy. See *e. g. Sylvania, supra*, at 58, n. 28, 97 S.Ct. at 2561, n. 28. We need not consider the continuing validity of *General Motors*. See generally Posner, *The Rule of Reason and the Economic Approach: Reflections on the* Sylvania *Decision*, 45 U.Chi.L.Rev. 1 (1977).

against group boycotts than in reference to any other aspect of the *per se* doctrine." Sullivan, *Handbook of the Law of Antitrust,* § 83 at 229–30 (1977).

The term "group boycott" can be applied to divergent types of concerted activity, not all of which necessarily have a pernicious effect on competition or lack any redeeming virtue. The simple use of labels cannot suffice, because this would create the possibility that reasonable concerted activity would be proscribed. *See Worthen Bank & Trust Co. v. National Bankamericard Inc.,* 485 F.2d 119, 125 (CA8 1973), *cert. denied,* 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974). The broad language of *Klor's* and *General Motors* is not helpful in resolving this case.

Two recent Second Circuit decisions are instructive. In *Oreck Corporation v. Whirlpool Corporation,* 579 F.2d 126 (CA2 1978) (en banc), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338, *rehearing denied,* 439 U.S. 1104, 99 S.Ct. 883, 59 L.Ed.2d 65 (1979), Oreck charged Whirlpool and Sears with engaging in a conspiracy in unreasonable restraint of trade to exclude Oreck from the vacuum cleaner market. Oreck had been the exclusive distributor of vacuum cleaners under the "Whirlpool" name. Whirlpool also had manufactured vacuum cleaners for resale by Sears under the "Kenmore" label. The conspiracy was based on Oreck's allegation that Whirlpool did not extend Oreck's exclusive distributorship at the behest and insistence of Sears, a much larger purchaser of Whirlpool products. Under the jury instruction given, "the jury could simply have found an agreement by Sears and Whirlpool to exclude Oreck from the sale of Whirlpool vacuum cleaners and, *on that basis,* have found them guilty (as it in fact did) of a *per se* violation of § 1 of the Sherman Act." *Id.* at 129. The jury was not required to find

the existence of an anticompetitive purpose or effect.

The Second Circuit found that an instruction on a *per se* theory was inappropriate. The court stated

"It is important to distinguish between 'horizontal' restraints, *i. e.* agreements between competitors at the same level of market structure, and 'vertical' restraints, *i. e.* combinations of persons at different levels of the market structure, such as manufacturers and distributors. . . . Horizontal restraints alone have been characterized as 'naked restraints. of trade with no purpose except stifling competition,' . . . and, therefore, *per se* violations of the Sherman Act. On the other hand, while vertical restrictions may reduce intrabrand competition by limiting the number of sellers of a particular product, competing for a given group of buyers, they also promote interbrand competition by allowing a manufacturer to achieve certain efficiencies in the distribution of its products. . . . They are, therefore, to be examined under the *rule of reason* standard." *Id.* at 131 (Citations omitted).[6]

Because the restraint involved was characterized as vertical, the court expressed a reluctance to use the *per se* rule because to do so would interfere with the business decisions of a manufacturer without any assurance that the purposes of the Sherman Act would be served thereby.

"It has always been the prerogative of a manufacturer to decide with whom it will deal. See *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465 [63 L.Ed. 992] (1919). Any alleged inducements by Sears to Whirlpool to allow the contract with Oreck to expire may have amounted to tortious interference; but, without some further showing that from this

---

6.  "The rule of reason provides a more discriminating way of differentiating true exclusive dealerships from two-firm vertical combinations to exclude a distributor from supply. . . . 'Per se* rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive,' *Continental T. V., Inc. v. GTE Sylvania, Inc., supra,* [433

U.S.] at 49–50, 97 S.Ct. 2549, 2558 [53 L.Ed.2d 568]; and where the conduct involved is an agreement between a single manufacturer and a single distributor which results in a sole distributorship for the manufacturer's products, a careful inquiry into the business justifications for the agreement is required." *Oreck, supra,* at 131–2, n. 6.

course of conduct there was an anticompetitive effect in the vacuum cleaner industry as a whole, it is inconsistent with the sanctity of contractual arrangements to allow the antitrust laws to inject a provision into the agreement which would require Whirlpool to renew Oreck's distributorship for as long as it is able to compete successfully with Sears. In this case, therefore, something more than an agreement between Whirlpool and Sears to eliminate Oreck must be shown. The agreement becomes violative of § 1 of the Sherman Act only if it is *anticompetitive in purpose or effect*—in sum, it must be tested by the rule of reason. Without any consideration of the anticompetitive purpose or effect, arbitrarily seeking to protect Oreck simply because Whirlpool refused to renew a contract with Oreck which had terminated by its own terms, even though this refusal was in whole or in part, due to persuasion by Sears, disregards the well established rule that 'the antitrust laws ... were enacted for "the protection of *competition*, not *competitors*' ...." ' " *Id.* at 133–4.

In *Borger v. Yamaha International Corporation*, 625 F.2d 390 (CA2 1980), a case with facts much like those in the instant case, the Second Circuit again refused to apply the *per se* rule to activity which could conceivably be labeled as a "concerted refusal to deal." Yamaha, a United States importer of various consumer products, including high fidelity audio equipment, distributes its audio products through franchised dealers in a limited distribution system. After some preliminary negotiations, it appeared that Borger would become a franchised dealer in Manhattan. Prior to consummation of the franchise agreement, Yamaha contacted two existing Yamaha dealers in Manhattan and discussed Borger's appointment as a dealer. The two dealers expressed a negative reaction to the appointment and Yamaha subsequently decided not to grant Borger the dealership.

Borger brought an action against Yamaha and its dealers alleging two violations of Section 1 of the Sherman Act, a group boycott and a conspiracy to fix prices. Borger also alleged breach of contract and promissory estoppel, but the district judge refused to submit these counts to the jury. The jury returned a verdict in favor of Borger. The Second Circuit reversed and remanded because of errors in the instructions similar to those which existed in *Oreck*.

The district court judge had instructed the jury that because "there was no evidence to support a finding of horizontal combination or contract, the question for the jury was whether Yamaha had entered into a *vertical* combination with one or both of the dealers with whom it consulted prior to rejecting Borger's application." *Id.* at 394 (emphasis added). The jury was instructed on a rule of reason theory. The instructions, however, stated that a finding of illegality would be justified if Yamaha had the sole purpose of protecting either or both of the existing dealers from competition. The Second Circuit, relying on *Oreck*, stated "In the instant case, the jury was instructed to find Yamaha liable solely on the basis of a purpose to restrict intrabrand competition, without any finding of either a purpose or effect related to interbrand competition. This was reversible error." *Id.* at 397. We find that the logic used by the Second Circuit is sound.

In both *Oreck* and *Borger* the vertical-horizontal distinction was crucial to the determination of whether to apply a *per se* or a rule of reason analysis. The importance of this distinction has been recognized in this circuit as well. We said, in *Gough v. Rossmoor Corporation*, 585 F.2d 381 (CA 9 1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979), that

"In all cases so far holding such restraints to be *per se* unreasonable, there has been some horizontal concert of action taken against the victims of the restraint. In *Mutual Fund Investors v. Putnam Management Co., supra*, this court rejected the contention that the refusal to deal there under fire constituted a *per se* illegal group boycott, stating 'At issue is an alleged conspiracy among vertically integrated organizations, and agreements among them are not *per se* illegal.' 553 F.2d at 626." *Id.* at 387. (Footnote omitted).

The vertical-horizontal distinction is not always dispositive. In *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (CA3 1979), the court was faced with the termination, by a manufacturer of kitchen cabinets, of one of its customers, a discount house, at the behest of another customer, a retailer, allegedly because of price considerations. On appeal from a grant of summary judgment for the defendants, the court considered whether a *per se* rule could have been applied to the challenged conduct.[7] The court asserted that *Sylvania* did not necessarily mean that any restraint which could be characterized as vertical could not be analyzed under a *per se* approach.

"When a manufacturer acts on its own, in pursuing its own market strategy, it is seeking to compete with other manufacturers by imposing what may be defended as reasonable vertical restraints. This would appear to be the rationale of the *GTE Sylvania* decision. However, if the action of the manufacturer or other supplier is taken at the direction of its customer, the restraint becomes primarily horizontal in nature in that one customer is seeking to suppress its competition by utilizing the power of a common supplier. Therefore, although the termination in such a situation is, itself, a vertical restraint, the desired impact is horizontal and on the dealer, not the manufacturer, level." *Id.* at 168.

The court emphasized that the motivating factor in the alleged conspiracy was price, *i. e.* the conspiracy sought to protect the existing retailer from the price competition of a discounter. *Oreck* was distinguished because, in addition to a lack of proof that price control was the likely purpose of the Whirlpool-Sears agreement, Whirlpool had done no more than refuse to renew a contract while the manufacturer in this case had breached a two year agreement after only three months. In *Cernuto*, therefore, there was clearly less of a likelihood that the manufacturer's decision could be considered an element of its own mar-

keting strategy. In conclusion, the court stated that

"If Cernuto can prove at trial that United, Lappin and Famous conspired to protect Famous from price competition by Cernuto, and that United and Lappin terminated Cernuto at Famous' request and in pursuit of a price related end, then it can prevail on a price-fixing theory notwithstanding its failure to show any impact on competition involving kitchen cabinet sales in Western Pennsylvania." *Id.* at 170.

While allowing the possibility that plaintiff's theory could be disproved, the court, because of the procedural posture (appeal from a grant of a motion for summary judgment), assumed the facts were as plaintiff had stated.

It seems, therefore, that a characterization of a restraint as vertical or horizontal is not necessarily determinative of the analysis—either *per se* or rule of reason—to be applied. In fact, it has been noted by one commentator that

"A number of decisions involving concerted refusals to deal have turned upon the relationship between the boycotting parties; that is, whether the agreement could be characterized as at least partially horizontal or as solely vertical. This distinction has only limited utility. When considered apart from the purpose and the effect of the agreement, it can lead to undesirable results." *Bauer, supra*, at 712.

We have recognized, in *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (CA 9 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755, *rehearing denied*, 397 U.S. 1003, 90 S.Ct. 1113, 25 L.Ed.2d 415 (1970), that the presence of a horizontal element does not require the use of a *per se* rule. *Hawaiian Oke* indicates that an inquiry must be made to determine whether there exists an anticompetitive purpose or effect.[8] And it must be emphasized that it is interbrand

---

7. The court mentioned that a 'rule of reason' analysis would not be available to the plaintiff because the necessary anticompetitive effects as to a particular product in a relevant market

could not be proven. *Cernuto, supra*, at 165 and n. 1.

8. In deciding whether to apply a *per se* rule the courts examine the nature, history, purpose

competition which is the primary concern of the antitrust laws. *Sylvania, supra,* at 52, n. 19, 97 S.Ct. at 2558 n. 19.

Although FDI contends that its actions were solely unilateral, we assume, because on review of a grant of a motion for summary judgment we draw all reasonable inferences in favor of the nonmoving party, that FDI and Wakehouse acted jointly.[9] This concert of action does not, however, mean that appellant's version of the facts justify the application of a *per se* rule. The use of a *per se* rule could only be justified if, drawing all reasonable inferences in fa-

and probable effect of the restraint. This rather extensive inquiry is appropriate, although at least one commentator concluded that the benefits of such a *per se* rule are illusory.

> "A boycott rule which is not geared to a cogent test of effect on competition is thus completely unmanageable. Even with such a test, it seems very doubtful that efforts to call it per se would serve any useful purpose. A boycott is a general method of doing business and lacks the specificity of price-fixing or territorial division which are practices that lend themselves more immediately to per se treatment. Price-fixing lays its hand obviously and directly upon the primary mechanism of competition. Division of territory is an out and out agreement not to compete. But a boycott must be connected up with competition before it can be condemned with assurance. The connecting up process, of course, is the very exercise of 'reason' which a per se rule seeks to obviate.... Surely ... the boycott rule, can[not] be said to contribute very much to certainty at this point. Nor ... [is it] likely to save much time and effort in administration and trial.... [I]t would seem that nearly as much time will be consumed in ascertaining whether the transaction fits the category as would be consumed without any rule, and substantially the same economic ground will have been covered." Rahl, *supra,* at 1172–73.

We believe that despite the apparent lack of ease in application there is some benefit to the use of a *per se* rule in the concerted refusal to deal context. Professor Bauer has advocated a modified *per se* rule:

> "Courts should apply a per se rule to group boycotts only when two conditions are met: first, the conduct must be intended to coerce or exclude other entrepreneurs; second, the conduct must be likely to have anticompetitive effects. A third factor—the defendant's market power—may bear on the purpose of a concerted refusal to deal and its likely effect; courts should be less disposed to apply the per se rule where the defendant's share of the market is small. Unless both of these conditions are met, the court should apply the rule of reason." Bauer, *supra,* at 705.

It seems apparent that an inquiry of this nature is somewhat less elaborate than that required under the rule of reason and that it properly focuses attention on the relevant inquiry, *i. e.,* the probable effect on competition.

9. There is no allegation that there exists another conspirator at the distributor level. There is no assertion that FDI has sought to preclude alternative sources of supply.

Appellant maintains, seemingly as an afterthought, that, in addition to the vertical component, there exists a wide ranging horizontal conspiracy including all the Fiat dealers in the Northwest. The only evidence which allegedly supports the existence of this conspiracy is the May 21, 1975 mailgram. The magistrate, in his discussion of the group refusal to deal claim, did not even mention the possibility that the decision not to grant appellant a Fiat dealership went beyond the one-to-one arrangement between FDI and Wakehouse. We agree with the magistrate's implicit conclusion that there does not exist "significant probative evidence" to support the existence of a wide ranging conspiracy. We note that there is no indication that the other Fiat dealers played any role in the decision to return appellant's check or to grant Wakehouse the two probationary periods in which to increase sales. The mailgram was sent after these events occurred. There is no indication that the other dealers had any effect on the decision not to appoint appellant. There is also no indication that there was any horizontal market division or dealer cartelization. Professor Posner noted, in suggesting an approach to restricted distribution cases which attempts to isolate and condemn only restrictions imposed nominally by the manufacturer but which are in fact desired for monopolistic purposes by dealers using the manufacturer as their enforcement agent, that

> "Under this test, many cases would be dismissed simply on a showing that the dealers' share of the relevant market was too small to give them the power to collude effectively. If American Motors has two percent of the U. S. automobile market and its dealers sell only American Motors cars, it is inconceivable that the purpose of giving American Motors dealers exclusive territories is to cartelize the distribution of automobiles. While it is true that, in principle, some (very few) consumers may so prefer American Motors to competing brands of automobiles that the dealers in those cars face as a group a downward-sloping demand curve, the slope is too close to being horizontal for courts to worry about dealer collusion." Posner, *supra,* at 17 (Footnote omitted).

vor of appellant, the challenged conduct clearly had, or was likely to have, a pernicious effect on competition and lacked any redeeming virtue. We cannot say that this is the case and, consequently, find that the rule of *per se* illegality has no role in our disposition of the case.

■ Appellant seems to argue that the *per se* rule should be applied because the challenged conduct was undertaken with the purpose of allowing Wakehouse to continue to extract monopoly profits. This theory is based on appellant's view that Fiat cars constitute the relevant product market. The magistrate concluded that the relevant product market was cars in general. The lower court concluded that appellant "should not be allowed to go to trial on its unsupported allegation that, for 'a sizeable number of customers . . . [o]nly a Fiat, . . . , will do.'" We agree with this assessment. Appellant has not presented significant probative evidence which contradicts the assertion that the product market involved is characterized by vigorous interbrand competition.[10] There has been no suggestion that the failure to increase intrabrand competition for a product with a very small share of the market had any effect whatsoever on interbrand competition.

■ Fiat's insignificant market power in a market characterized by vigorous interbrand competition is important to our analysis. We note, at the outset, that the antitrust laws are primarily concerned with interbrand competition. This is true because the existence of interbrand competition "provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product." *Sylvania, supra*, 433 U.S. at 52, n. 19, 97 S.Ct. at 2558, n. 19. The market conditions make it evident that appellant's contention that

the challenged conduct was undertaken solely to allow Wakehouse to continue to reap monopoly profits is simply unfounded. There is no significant probative evidence which supports that proposition. In fact, appellant seems to recognize that an important factor in FDI's decision to postpone its decision to appoint an additional dealer was its desire to stimulate Wakehouse's sales, *i. e.*, its desire to promote interbrand competition. The desired increase in Wakehouse's sales convinced FDI that it was not in its economic interests to appoint appellant as an additional dealer. It is clear, therefore, that the failure to increase intrabrand competition was not necessarily pernicious. The courts have recognized the benefit to encouraging the promotion of interbrand competition which occurs by allowing a business to distribute its products in a particular fashion. *Sylvania, supra*, 433 U.S. at 54, 97 S.Ct. at 2559.

■ Businessmen may, within certain limits, decide to deal with whom they wish. Our conclusion, or a plaintiff's, that a defendant exercised poor business judgment, that a defendant treated someone unfairly, or that a potential competitor has been injured does not mean that the antitrust laws have been violated. The cases discussed above indicate that the courts are reluctant to interfere with a company's business decision to distribute its products in a particular fashion. We do not expect businesses to be run in an altruistic fashion, but, particularly when there is vigorous interbrand competition, "the interests of the manufacturer and the consumer with regard to product distribution coincide." 92 Harv.L.Rev. 1160, 1164 (1979). It is in the interests of FDI to see to it that its product is distributed in an efficient fashion. The economic interests of FDI dictate that it seek to improve sales. It is clear that the desire to stimulate sales was a factor in FDI's decision not to appoint an additional dealer.[11] Appellant seems to recognize this,

10. On the facts of this case we agree with the magistrate's determination not to treat the subsidiary markets—parts, service and warranty—as separate from the market for cars. We note that the dispute is over the rejection of the application for a Fiat dealership, which includes, in addition to the retail sale of cars, the parts and service work. There is no indication

that these were treated separately in the application process and we refuse to do so for purposes of our analysis.

11. This militates against the position that FDI succumbed to the economic pressure of a small dealer in order to allow that dealer to restrict sales in its effort to extract monopoly profits.

but it continues to attach talismanic significance to the existence of an additional competitor. The antitrust laws are concerned with competition and we must recognize that FDI's decision not to appoint an additional dealer in an effort to expand its small share of the market had the potential to benefit competition.[12] Accordingly, we cannot say that the use of a *per se* rule would be justified. There is assuredly no "significant probative evidence" which would indicate that the challenged conduct had, or was likely to have, a pernicious effect on competition or lacked any redeeming virtue. Therefore, the rule of reason is the appropriate analysis. This analytical framework provides a more discriminating tool by which to evaluate the competitive significance of the challenged conduct.

■ There is a greater reluctance to uphold a grant of summary judgment when the rule of reason is the appropriate standard. *Harold Friedman Inc. v. Thorofare Markets, Inc.*, 587 F.2d 127, 141, n. 51 (CA3 1978); 92 Harv.L.Rev. 1160, 1167–9 (1979). This court once commented, however, that because there was no tenable *per se* boycott theory "appellants must evince a substantially adverse effect on competition in the relevant market to support a viable legal theory. Appellants point to the alleged injury to their businesses, but fail to provide any evidence that the 'effect upon competition in the marketplace is substantially ad-

verse.' " *Mutual Fund, supra,* at 627. Appellant's case suffers from the same deficiencies noted in *Mutual Fund.*

■ We hold that the grant of the motion for summary judgment was proper. Primarily because of the market structure and Fiat's small percentage of that market, the decision not to appoint an additional dealer cannot be said to be so plainly anticompetitive as to justify resort to a *per se* rule. The rule of reason is, therefore, the appropriate standard. And even under that standard appellant cannot withstand a motion for summary judgment. Appellant has simply failed to evince "significant probative evidence" of a substantially adverse effect on competition.

### C. TYING OR EXCLUSIVE DEALING ARRANGEMENT.

■ The magistrate rejected appellant's tying arrangement claim, noting that "Plaintiff simply fails to show the existence of two separate products." We agree. Appellant had simply misconstrued the case law concerning tying arrangements. The challenged conduct bears absolutely no relation to a tying arrangement.

A charitable reading of appellant's allegations indicate that what is being objected to is an *offer* to enter into an exclusive dealing arrangement. There was no executed transaction.[13] Although there are numerous reasons [14] which support the propri-

---

**12.** It is not sufficient for appellant to assert that a viable legal theory is stated because of an abstract lessening of intrabrand competition. See *Alladin Oil, supra,* at 1116. This is not sufficient to make out a *per se* violation of the Sherman Act. This is not a case involving the termination of an existing dealer as discipline for price-cutting tactics. See *Cernuto, supra,* at 170; Bauer, *supra,* at 715. This case, as appellant conceded, does not involve what may very well be considered to be a naked restraint on competition. FDI simply decided to increase its small percentage of the Portland market through its existing distributional scheme. Appellant admits that FDI was attempting to increase its sales through Wakehouse, but alleges that the failure to increase intrabrand competition precludes our recognition of the increase in interbrand competition as a "redeeming virtue." As our discussion makes plain, we simply disagree with this reading of the relevant case law.

**13.** In fact, appellant's objection is not so much to the alleged exclusive dealing arrangement as it is to FDI's refusal to enter into the arrangement. Thus, it is clear that it is the decision not to appoint an additional dealer which is the basis of appellant's claim. The "sacrifices" allegedly made by appellant during the application process would be more relevant to proving the existence of a dealership agreement on a promissory estoppel theory. As we have noted, the contract issues already resolved against appellant in the state court are not before us.

**14.** For example, there is no indication that an exclusive dealing arrangement such as that described by appellant would have any, much less a substantial, effect on competition. *See Brattleboro Auto Sales, Inc. v. Subaru of New England, Inc.*, 633 F.2d 649 (CA2 1980).

ety of the grant of summary judgment on the issue, it suffices to say that Section 3 of the Clayton Act has no application in the absence of an executed agreement. *McElhenney Co. v. Western Auto Supply Co.*, 269 F.2d 332 (CA4 1959); *Leo J. Meyberg Co. v. Eureka Williams Corp.*, 215 F.2d 100 (CA9 1954), *cert. denied*, 348 U.S. 875, 75 S.Ct. 113, 99 L.Ed. 689; *Nelson Radio & Supply Co. v. Motorola*, 200 F.2d 911 (CA5 1952), *cert. denied*, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953).

### CONCLUSION

The decision of the district court to grant summary judgment in favor of appellees was appropriate and, therefore, we affirm.

IT IS SO ORDERED.