PACIFIC STATIONERY & PRINTING CO., an Oregon corporation, Plaintiff-Appellant,

v.

NORTHWEST WHOLESALE STATIONERS, INC., an Oregon cooperative corporation, Defendant-Appellee.

No. 82–3049.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 4, 1983.

Decided Sept. 16, 1983.

---

George J. Cooper, III, Morrison, Dunn, Miller & Carney, Portland, Or., for plaintiff-appellant.

Gregory A. Hartman, Willner, Bennett, Bobbitt & Hartman, Portland, Or., for defendant-appellee.

Before FERGUSON, BOOCHEVER and NORRIS, Circuit Judges.

FERGUSON, Circuit Judge:

Northwest Wholesale Stationers, Inc. ("Northwest") is a non-profit cooperative association composed of retail office supply outlets in the Pacific Northwest. It operates as a purchasing cooperative, obtaining office supplies at substantial volume discounts, and operating warehousing facilities greater than individual outlets can maintain for themselves. Additionally, as a cooperative organized under the laws of Oregon, Northwest distributes its profits annually to its members in the form of refunds or rebates. Such practices by a cooperative association are exempt from price discrimination prohibitions under 15 U.S.C. § 13b and also under an Oregon statute, Or.Rev. Stat. § 646.030.

Pacific Stationery & Printing Co. ("Pacific") operates a retail office supply store in Portland and also maintains some wholesale operations. Since June 1958 it had been a member in good standing of the Northwest

cooperative; however, in September 1978, Pacific was expelled from the cooperative without notice of the grounds for its expulsion or an opportunity to be heard on the decision.

Pacific brought suit, alleging that its expulsion in the absence of any procedural safeguards was a *per se* violation of Sherman Act § 1. The district court refused to find *per se* liability and, in the absence of a showing of actual anticompetitive effect in the relevant market required for a rule of reason claim, granted summary judgment in favor of Northwest. Because we find that the uncontroverted facts of this case support a finding of *per se* liability, we reverse.

## I.  *Per Se* Condemnation of Group Boycotts

It is important to establish at the outset just what antitrust violation is charged. On the one hand, Pacific's expulsion from the cooperative means that it will no longer receive rebates based on its purchases from the cooperative. In other circumstances, it would be plausible to interpret such a situation as a price discrimination. However, the practice of giving rebates to cooperative members—and not giving them to non-members—is specifically deemed *not* to be subject to price discrimination prohibitions by both federal and state statute. Pacific's complaint is not that, as a non-member, it has been denied rebates available to members. It is rather that it has, as a member, been expelled from membership without the safeguards necessary to assure that cooperatives not expand their limited exemption under the Robinson-Patman Act to a general exemption from antitrust regulation.

Additionally, Pacific loses more by virtue of its expulsion than access to Northwest's rebate policy. It also loses the ability to use Northwest's superior warehousing and expedited order-filling facilities, as well as any competitive advantages that may flow simply from being known in the industry as a member of an established cooperative.

In any event, the antitrust violation charged is that the cooperative members have refused to deal with Pacific on an equal footing with other members. We thus treat it as a concerted refusal to deal, or "group boycott."

Recognizing the complex economic inquiry necessitated by the "rule of reason" standard articulated in *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), the Supreme Court has, on various occasions, identified "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal . . . ." *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1957). One of the practices which is held to merit such *per se* condemnation is a group boycott. *See id.; Silver v. New York Stock Exchange,* 373 U.S. 341, 348–49, 83 S.Ct. 1246, 1252–53, 10 L.Ed.2d 389 (1963); *Klor's v. Broadway-Hale Stores,* 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959); *Fashion Originators' Guild v. Federal Trade Comm'n,* 312 U.S. 457, 468, 61 S.Ct. 703, 708, 85 L.Ed. 949 (1941).

However, "by its very nature the *per se* approach paints with a very broad brush and eliminates economic cooperation which may be both necessary and desirable." *Denver Rockets v. All-Pro Management, Inc.,* 325 F.Supp. 1049, 1064 (C.D.Cal.1971). For this reason, it is often necessary for courts to distinguish between those concerted refusals to deal which belong to the category of group boycotts the Court was concerned to prevent and those which do not. In making this distinction, the courts cannot apply a rule of reason approach to the particular facts of each case; such an approach would make a mockery of *per se* analysis. Rather, we must identify those features of group boycotts condemned by the Supreme Court which persuaded the Court to find them *per se* illegal.

In *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71,

77 (9th Cir.1969), relied on by Northwest, this circuit adopted the distinction advanced in Barber, *Refusals to Deal Under the Federal Antitrust Laws,* 103 U.Pa.L.Rev. 847, 876–77 (1955). Barber argues that the *per se* principle of the group boycott cases is inapplicable to agreements that "do not involve combining for the primary purpose of coercing or excluding; rather they involve combinations of two or more persons to further directly the business of the parties to the agreement, and the effect on third parties and on competition is indirect." *Id.* at 877; 416 F.2d at 77. This distinction properly avoids overly strict scrutiny of a manufacturer's decisions about the best way to distribute its product. Even when that decision is influenced by a competitor of the third party, the pro-competitive direct effects of the agreement may outweigh the anticompetitive indirect effects. The Barber analysis adopted by the *Hawaiian Oke* court allows for antitrust liability to be incurred only when the practice is anticompetitive on balance. 416 F.2d at 77–78; *Ron Tonkin Gran Turismo v. Fiat Distributors,* 637 F.2d 1376 (9th Cir.1981). Applying the distinction in *Hawaiian Oke,* the court found that "[t]he exclusion of plaintiff was merely the incidental result of appellants' agreement to transfer their lines to [another distributor]." It therefore found the group boycott cases not controlling. 416 F.2d at 80.

Applying the analysis used in *Hawaiian Oke* to the case at bar, however, yields an entirely different result. *Hawaiian Oke* involved a manufacturer-distributor relationship and " '[i]t has always been the prerogative [sic] of a manufacturer to decide with whom it will deal.' " *Ron Tonkin Gran Turismo v. Fiat Distributors,* 637 F.2d at 1383 (citation omitted). However, in the present case no such relationship exists between the Northwest members and Pacific. Pacific is involved in essentially the

same activity as all the other members and is not their distributor or manufacturer. Therefore, the members' decision to expel Pacific from the cooperative clearly was not initiated to further their business objectives by transferring to a more attractive distributor, but rather to refuse to deal with Pacific, a member on equal footing, and effectively to shut Pacific off from economic benefits unavailable to individual retailers. Thus here, in contrast to *Hawaiian Oke,* there is a true group boycott, which is *per se* illegal.

Nor can Northwest rely on the fact that Pacific was not excluded from the market as a whole. As the court noted in *Hawaiian Oke,* those cases where *per se* group boycott analysis was appropriate involved "concerted action by one group to put one or more of their competitors out of business, *or to impair their ability to compete with the conspirators.*" 416 F.2d at 77 (emphasis added), *citing Silver v. New York Stock Exchange,* 373 U.S. 341, 347, 83 S.Ct. 1246, 1252, 10 L.Ed.2d 389 (1963); *Radiant Burners v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945).

Cooperative members enjoy economic benefits unavailable to individual retailers. Although the Robinson-Patman Act, 15 U.S.C. § 13a, prohibits refund or rebate plans among competitors at the same distributional level, a specific exemption allows a cooperative association to return

> to its members, producers or consumers the whole, or any part of, the net earnings or surplus resulting from its trading operations, in proportion to their purchases or sales from, to, or through the association.

15 U.S.C. § 13b. A similar exception to state price discrimination prohibitions is provided by an Oregon statute.[1] The undisputed facts show that the refunds or re-

---

1. ORS 646.030 provides:
   ORS 646.010 to 646.180 [provisions of the state corollary to the Robinson-Patman Act] shall not prevent a cooperative association

   from returning to its members, producers or consumers the whole, or any part of, the net earnings or surplus resulting from its trading

bates provided by Northwest to its members during the years preceding this suit ranged between 11% and 14% of the prices paid by members for goods purchased through the cooperative. Additionally, Northwest maintains warehousing facilities not easily duplicated by individual retailers. Members can thus offer their customers quicker delivery on large volume and non-routine orders than can non-members. Excluding Pacific from enjoyment of such benefits may not be calculated to put it out of business, but it must "impair [its] ability to compete with the conspirators." 416 F.2d at 77.

## II. Procedural Safeguards

Having determined that Northwest's actions would normally constitute an illegal group boycott, we must next consider whether the legal and associational nature of the cooperative immunizes it from liability in the absence of procedural safeguards. The seminal case in this area is *Silver v. New York Stock Exchange*, 373 U.S. at 349–57, 83 S.Ct. at 1252–57, where the Court recognized that a "justification derived from the policy of another statute or otherwise" could prevent a concerted refusal to deal from being condemned under a *per se* analysis. *Id.* at 348–49, 83 S.Ct. at 1252.

In *Silver*, the plaintiff securities dealer was not a member of the Exchange. It was, however, permitted to maintain direct private communication lines with several member firms. These lines provided Silver with a significant competitive advantage over dealers who had no such lines. The Exchange ordered the member firms to discontinue the service to Silver, who then sued the Exchange, alleging a concerted refusal to deal.

The Supreme Court first noted that in the absence of justification, the cut-off would be *per se* illegal. It then examined the Securities and Exchange Act and held that, although no exemption from antitrust liability was provided, "particular instances of exchange self-regulation which fall within the scope and purposes of the Securities Exchange Act may be regarded as justified in answer to the assertion of an antitrust claim." 373 U.S. at 361, 83 S.Ct. at 1259. Self-regulation that did not provide for notice and hearing prior to terminating a valuable service, the Court concluded, was not so justified.

*Denver Rockets v. All-Pro Management*, 325 F.Supp. at 1064–65, in an extensive analysis of *Silver*, outlined a three-step test for determining whether an association that engages in a concerted refusal to deal qualifies for an exception to the *per se* rule. It said:

> Thus, *Silver* seems to envision the application of the *per se* rule to group boycott cases, with one narrow exception. A factual situation falling into this exception would be governed by the "rule of reason."

To qualify for this exception it would have to be shown that:

(1) There is a legislative mandate for self-regulation "or otherwise."

. . . .

(2) The collective action is intended to (a) accomplish an end consistent with the policy justifying self-regulation, (b) is reasonably related to that goal, and (c) is no more extensive than necessary.

(3) The association provides procedural safeguards which assure that the restraint is not arbitrary and which [furnish] a basis for judicial review.

*Id.*

The court emphasized *Silver's* primary focus on the issue of notice and hearing.

> According to the Court, the requirement of a hearing will, in itself, act as a check on illegitimate self-regulation. In addition, it will provide the antitrust court with a record from which it can determine whether the self-regulation is justified, necessary and sufficiently limited.

operations in proportion to their purchases

from, to, or through the association.

"Hence the affording of procedural safeguards not only will substantively encourage the lessening of anticompetitive behavior outlawed by the Sherman Act but will allow the antitrust court to perform its function effectively."

*Id.* at 1065 (quoting *Silver,* 373 U.S. at 363, 83 S.Ct. at 1260).

■ We see no reason why this analysis should not be applied here. The specific statutory exceptions for refunds or rebates provided to members of cooperative associations evince legislative recognition that self-regulation is appropriate. Procedural safeguards are necessary, however, both in order to allow a reviewing court to determine whether the association has, in a particular case, exceeded the scope of justified self-regulation and to prevent such self-regulation from encroaching on vigorous competition.

We must remember that the rationale for analyzing actions that have potential anticompetitive effect under the rule of reason is a recognition that redeeming virtues may be present which in turn might outweigh the potential harm. In *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) such redeeming virtues were found in the ability of manufacturers to more efficiently and cheaply distribute their products, and the increase in competition at the manufacturing level that would flow from dealers putting increased efforts into distribution without the threat of "free riders." When there are efficiencies present that would tend to *increase* competition, a practice that would otherwise be unlawful may be justifiable.

If a hearing is provided before termination, then the increase in competition envisioned by Congress when it decided to encourage the formation of cooperatives by exempting certain practices from price discrimination prohibition is more likely to be achieved, and can be weighed against whatever *actual* anticompetitive effect flows from the termination. If no hearing has been provided, however, the fact that such an organization can cut off a member from the ability to compete effectively without *any* statement of reasons that would allow the reviewing court to assess whether redeeming virtues exist in the situation makes the practice so likely to be anticompetitive that it can be treated as *per se* unreasonable, under the standards enunciated in *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

Because no procedural safeguards were accorded here, Northwest cannot qualify for the narrow rule of reason exception to the usual *per se* rule against group boycotts.

We therefore REVERSE.

NORRIS, Circuit Judge, dissenting:

The majority holds that a nonprofit cooperative association commits a *per se* violation of the antitrust laws if it expels a member without giving notice of · the grounds for the expulsion and an opportunity to be heard. I find that ruling to be unprecedented and the rationale behind it remarkable.

After Northwest terminated Pacific's membership, Pacific could have continued to purchase supplies from Northwest. But as a nonmember, it was not entitled to rebates. The termination of membership thus resulted in price discrimination against Pacific, which would normally constitute a violation of the Robinson-Patman Act, 15 U.S.C. § 13a (1976). As the majority concedes, however, the method of price discrimination at issue here is condoned by Congress, for an explicit exemption allows a cooperative to return

> to its members, producers or consumers the whole, or any part of, the net earnings or surplus resulting from its trading operations, in proportion to their purchases or sales from, to, or through the association.

15 U.S.C. § 13b (1976). I see no ground for believing that Congress intended to qualify

that exemption by requiring cooperatives to provide recipients of rebates with notice and a hearing before cutting off their entitlement to rebates by terminating their membership. The majority nevertheless declares that a cooperative that expels a member without affording such procedural safeguards not only loses the Robinson-Patman Act exemption, but in addition incurs *per se* liability for treble damages under the antitrust laws.

In the majority's view, Pacific is entitled to the procedural safeguards whether or not it is entitled to the rebates. Indeed, the majority baldly states: "Pacific's complaint is not that, as a non-member, it has been denied rebates available to members."[1] At 1394–1395. I must disagree. As Pacific states in its brief, the competitive advantages enjoyed by members in the form of rebates constitute the "primary focus of this litigation." Opening Brief for Appellant at 7.

It is true that when Pacific was expelled, it lost such ancillary benefits as warehousing facilities and opportunities for expedited orders in addition to the rebates. And perhaps the loss of incidental competitive advantages is more troublesome than the loss of the rebates, since the Robinson-Patman Act exemption covers only rebates. I note, however, that in conceding that the expulsion of Pacific could be treated as the equivalent of price discrimination, the majority implicitly suggests that if loss of rebates alone were at issue, the *per se* rule might be inappropriate. Yet in assessing the probability of anticompetitive effect, and deeming it high enough to justify *per se* illegality, the majority factors in the eleven to fourteen percent price differential between members' and nonmembers' prices.

In any event, I believe that by authorizing disparate treatment in the form of price discrimination, the Robinson-Patman Act exemption casts considerable doubt on the propriety of applying a *per se* rule in this sort of case at all. Here the "group boycott" consists not in a refusal to do business, but in expulsion from a cooperative; the principal economic effect of the boycott is Congressionally sanctioned price discrimination against a nonmember. In my view, the loss of the incidental benefits of membership, never emphasized by Pacific, provides woefully inadequate justification for re-writing the exemption.

Moreover, I think the cases on which the majority relies are inapposite. Neither *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), nor *Denver Rockets v. All-Pro Management,* 325 F.Supp. 1049 (C.D.Cal.1971), provides authority for burdening the Robinson-Patman Act exemption with a judicially-mandated, extrajudicial hearing, for neither case dealt with disparate treatment that Congress had expressly sanctioned. In *Silver,* the Supreme Court rejected the New York Stock Exchange's claim that the Securities Exchange Act of 1934 granted it an exemption from antitrust liability. Therefore, in holding that the New York Stock Exchange violated the antitrust laws when it divested a securities dealer of the means to communicate directly with members of the Exchange, the Court itself had to reconcile the Securities Exchange Act with the antitrust laws. In so doing, it found the imposition of procedural safeguards necessary to carry out the purposes of the Exchange Act—purposes peculiar to that Act, which appear to have nothing to do with

---

1. Instead, the majority reasons, Pacific's complaint is that "it has, as a member, been expelled from membership without the safeguards necessary to assure that cooperatives not expand their limited exemption under the Robinson-Patman Act to a general exemption from antitrust regulation." *Id.*

I confess I fail to understand the distinction between the complaint the majority ascribes to Pacific and the complaint it disclaims on behalf of Pacific. The procedural safeguards the majority writes into the law are valuable to Pacific only to the extent that they safeguard benefits Pacific deems valuable. As I understand it, Pacific seeks a hearing in order to safeguard its status as a member, primarily so that it will receive rebates. To treat the procedural safeguards as a substantive right—or even a substantive desire on the part of Pacific—merely confuses the issue.

the legislative purposes underlying the express exemption created for cooperatives under the Robinson-Patman Act. *Denver Rockets,* the majority's only other precedent for imposing procedural safeguards, dealt with a professional football league that made no claim it had been granted an antitrust exemption by Congress. Thus, neither *Silver* nor *Denver Rockets* provides authority under the federal antitrust laws for denying a cooperative the protection of an express antitrust exemption permitting it to accord rebates to members but not to nonmembers.

Apart from the absence of any indication that Congress intended to qualify the exemption by requiring cooperatives to provide procedural safeguards, I find support for my view in the fact that state law ordinarily governs the relationship between a cooperative and its members. Here the Oregon Cooperative Corporation Act, under which Northwest is organized, does not require a cooperative to give notice and an opportunity to be heard before expelling a member. Rather, the statute expressly provides:

> Bylaws may provide for termination of membership and the conditions and terms thereof.

62.145(3). The majority effectively writes into all state laws governing nonprofit cooperatives a federally mandated hearing. For the federal judiciary to engraft such a requirement to state cooperative laws is an intrusion on state law wholly unwarranted by the federal antitrust laws.

Finally, the majority attempts to justify the imposition of procedural safeguards because such safeguards "are necessary . . . both in order to allow a reviewing court to determine whether the association has, in a particular case, exceeded the scope of justified self-regulation and to prevent such regulation from encroaching on vigorous competition." At 1397–1398. I find this rationale to be rather curious. I see no reason for reading into the antitrust laws a requirement that expelled cooperative members be granted extrajudicial opportunities to develop a record. I should think that the federal rules of discovery are more than adequate for that purpose.

In disagreeing with the majority, I recognize that the Robinson-Patman exemption does not cloak Northwest with absolute antitrust immunity. *See, e.g., Mid-South Distributors v. FTC,* 287 F.2d 512, 516 (5th Cir.), *cert. denied,* 368 U.S. 838, 82 S.Ct. 36, 7 L.Ed.2d 39 (1961); *American Motors Specialties Co. v. FTC,* 278 F.2d 225, 229 (2d Cir.), *cert. denied,* 364 U.S. 884, 81 S.Ct. 169, 5 L.Ed.2d 105 (1960). *Cf. United States v. Borden Co.,* 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939) (limited antitrust exemption for agricultural cooperatives under Capper-Volstead Act, 7 U.S.C. §§ 291, 292 (1976)). I merely agree with the district court that Northwest's conduct in expelling Pacific should be judged directly under the rule of reason; I think that the majority's intervening *per se* analysis is unnecessary and unwarranted. Under the rule of reason, of course, Northwest could not seek refuge in the Robinson-Patman exemption if it conspired with some members to terminate other members for anticompetitive purposes and thereby achieved anticompetitive results. I see no justification, however, for converting the expulsion of Pacific into a *per se* violation, entitling Pacific to treble damages, simply because Northwest has not adopted a bylaw providing notice and an opportunity to be heard before terminating a membership. In short, I cannot support an antitrust analysis that ends once it has been determined that the cooperative has failed to provide the expelled member with a hearing.